HEWLETT-PACKARD COMPANY, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3151–75.    Filed January 31, 1977.

*John B. Jones, Jr.,* and *Michael R. Levy,* for the petitioner.
*Robert E. Casey,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax as follows:

| TYE Oct. 31— | Amount of deficiency | TYE Oct. 31— | Amount of deficiency |
|---|---|---|---|
| 1967 | $158,119.01 | 1969 | $582,216.03 |
| 1968 | 135,309.01 | 1970 | 490,022.34 |

Other issues having been settled by the parties or severed for separate trial,[1] those remaining for decision are as follows:

(1) Whether petitioner effectively elected for its taxable years ended October 31 of 1967 through 1970, a method of accelerated depreciation for computing the earnings and profits of three of its controlled foreign subsidiaries when it filed for its taxable years ended in 1964 through 1967 its "written statement" and related information with the District Director, Internal Revenue Service, rather than with the Director of International Operations, Internal Revenue Service, Washington, D.C. 20225, as directed by section 1.964–1(c)(3)(ii), Income Tax Regs., for those taxable periods.

(2) Whether petitioner has satisfied for its taxable year ended October 31, 1968, the "minimum overall tax burden" test prescribed by section 1.963–4(a), Income Tax Regs., so as to be entitled to exclude from gross income for such year the subpart F income of Hewlett-Packard S.A., Geneva, Switzerland, a controlled foreign corporation.

### FINDINGS OF FACT

### General

Hewlett-Packard Co. (hereinafter petitioner), a California corporation, had its principal office in Palo Alto, Calif., at the time its petition herein was filed. For its taxable years ended October 31 of 1964, 1965, 1966, and 1967, petitioner filed its Federal income tax returns with the District Director of Internal Revenue, San Francisco, Calif. For its taxable years ended October 31 of 1968, 1969, and 1970, petitioner filed Federal income tax returns with the Internal Revenue Service Center, Ogden, Utah.

---

[1] Prior to the trial of this case, an issue concerning the computation of earnings and profits of certain of petitioner's controlled foreign corporations was severed for separate trial or other disposition pursuant to the Court's order dated June 10, 1976. More specifically, the severed issue concerns the basis for purposes of computing depreciation pursuant to sec. 167, I.R.C. 1954, and the regulations thereunder.

## *Issue 1. Accelerated Depreciation Election*

During the period from sometime prior to its taxable year ended in 1964 through its taxable year ended in 1970, petitioner owned 100 percent of the stock of Hewlett-Packard S.A., Geneva, Switzerland (hereinafter HPSA), which, in turn, owned 100 percent of the stock of two West German companies, Hewlett-Packard GmbH (hereinafter GmbH) and Hewlett-Packard VmbH (hereinafter VmbH). By reason of this ownership, HPSA, GmbH, and VmbH were controlled foreign corporations within the meaning of section 957(a).[2] During the same period referred to above, HPSA, together with its several second-tier subsidiaries including GmbH and VmbH, comprised a "chain of controlled foreign corporations," as defined in section 963(c)(2). Petitioner's taxable year ended October 31, 1964, was its first taxable year beginning after December 31, 1962, during which HPSA, GmbH, and VmbH were controlled foreign corporations or for which they were included in a chain election under section 963(c)(2).

Commencing with the taxable year ended October 31, 1964, and continuing through the taxable year ended October 31, 1970, the earnings and profits of HPSA, GmbH, and VmbH reflected adjustments for accelerated depreciation.

For each of its taxable years ended October 31, 1964, through October 31, 1970, petitioner filed Treasury Forms 2952 (Information Return with Respect to Controlled Foreign Corporations) with its Federal income tax return on behalf of HPSA, GmbH, and VmbH. Each such Form 2952 with respect to GmbH and VmbH stated that HPSA owned 100 percent of the respective corporation's stock. Each such Form 2952 with respect to HPSA stated that petitioner owned 100 percent of that subsidiary's stock. For each of its taxable years ended October 31 of 1965 through 1970, petitioner also filed Forms 3646 (Income From Controlled Foreign Corporation) with its Federal income tax return on behalf of HPSA, GmbH, and VmbH. Form 3646 was not in existence at the time petitioner filed its tax return for its taxable year ended October 31, 1964.

---

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the taxable years in issue, unless otherwise noted. References to certain Code sections which have been repealed subsequent to the periods herein before the Court are given in the present tense for purposes of this opinion.

Attached to and filed with each of petitioner's Federal income tax returns for its taxable years ended October 31, 1964, through October 31, 1970, was a statement of "Investments in Affiliates," which indicated that in each of these years petitioner owned 100 percent of HPSA, which, in turn, owned 100 percent of both GmbH and VmbH.

Attached to and made a part of petitioner's Federal income tax return for its taxable year ended October 31, 1964, timely filed on April 15, 1965, with the District Director of Internal Revenue, San Francisco, Calif., was a statement entitled "Statements of Consent to Elections under IRS Sections." Paragraphs C and D of that statement are as follows:

C. We wish to make a group election under Code Section 963 (minimum distribution rule) for the year ended October 31, 1964. Detailed schedule of the group is attached.

D. We also elect that under the provisions of Code Section 964 the earnings and profits and the deficits in earnings of the foreign group (Part C) for the year ended October 31, 1964 were determined according to the rules substantially similar to those applicable to domestic corporations.

Also attached to and made a part of that return was a schedule containing a page 3 entitled "Information Required of U.S. Shareholders with income from Controlled Foreign Corporations—Announcement 64–122—Year ended 10/31/64." Immediately above the figures on this page of the schedule appears the caption "Recast of Depr. 1964 Purchases from S.L. to 200% D.B. and Freight and Duty." With respect to HPSA, GmbH, and VmbH, the schedule identifies the amount of straight line depreciation per books of each and the amount of depreciation recast to a 200-percent declining balance. The schedule further shows that petitioner owned, directly or indirectly, 100 percent of the stock of HPSA, GmbH, and VmbH.

Attached to and made a part of petitioner's Federal income tax returns for its taxable years ended October 31, 1965, through October 31, 1967, each return timely filed with the District Director of Internal Revenue, San Francisco, Calif., were statements entitled "Statements of Consent to Elections under I.R.S. Sections." Paragraph D of the statement attached to the 1965 return is as follows:

We also elect that under the provisions of [C]ode section 964 the earnings and profits and the deficits in earnings of the foreign group * * * for the

year ended October 31, 1965 were determined according to the rules substantially similar to those applicable to domestic corporations; i.e.,

1. Accounting methods reflect the provisions of section 446 and the regulations thereunder.

2. Inventories in accordance with the provisions of section 471 and 472 and the regulations thereunder.

3. Depreciation computed in accordance with section 167 and the regulations thereunder.

The statements attached to the returns for the taxable years ended in 1966 and 1967 contain identical language with the exception of the applicable dates.

With respect to the years ended October 31, 1964, through October 31, 1967, petitioner's tax manager, who was responsible for filing its income tax returns, knew that a written statement was required in order to elect to adopt an accelerated depreciation accounting method for its controlled foreign corporations. However, for those years, he was not aware of the specific provisions of the Treasury regulations regarding such statements and was not aware that such statements were supposed to be filed with the Director of International Operations, Internal Revenue Service (sometimes hereinafter referred to as OIO), separate from its income tax returns. Prior to its taxable year ended October 31, 1964, petitioner's tax manager had never filed any forms with OIO on behalf of petitioner's foreign subsidiaries.

In 1968, during the course of an examination of petitioner's returns for the years ended October 31 of 1964 through 1967, an agent brought to the attention of petitioner's tax manager that these required statements should be more elaborate and detailed and should have been filed with OIO in Washington, D.C. With respect to each of its taxable years ended October 31, 1968, through October 31, 1970, petitioner timely filed with OIO, Washington, D.C., a statement in letter form with a subject heading "Statement of Consent to Elections Under I.R.S. Sections." Paragraph B of the statement filed in 1969 for the October 31, 1968, taxable year provides as follows:

We also elect that under the provisions of Code Section 964, the earnings and profits (or deficit in earnings and profits) of the foreign group * * * for the year ended October 31, 1968 were computed substantially as if such corporations were domestic corporations, i.e. [:]

1. Accounting methods reflect the provisions of Section 446 and the regulations thereunder; i.e., taxable income has been computed under the

accrual method of accounting. Adjustments for foreign accounting practices have been made to conform to U.S. accounting practices.

2. Inventories in accordance with the provisions of Section 471 and 472 and the regulations thereunder; i.e., inventories are valued at cost or market, whichever is lower, and freight and customs duty have been removed from its value.

3. Depreciation computed in accordance with Section 167 and the regulations thereunder; i.e., new assets with useful life of three or more years, the sum of the years digits method, used assets 150% declining balance method or straight line method. Useful lives and methods are similar to those used by the U.S. parent shareholder.

The statements filed in 1970 and 1971 for the taxable years ended October 31 of 1969 and 1970, contain identical language with the exception of the applicable dates. Each of these statements also indicates that petitioner owned, directly or indirectly, 100 percent of the stock of HPSA, GmbH, and VmbH.

In its Federal income tax returns with respect to its taxable years ended October 31, 1967, through October 31, 1970, petitioner claimed accelerated depreciation deductions in computing the earnings and profits of HPSA, GmbH, and VmbH, which exceeded straight-line depreciation computations by the following amounts:

*Taxable year ended Oct. 31—*

|  | 1967 | 1968 | 1969 | 1970 |
|---|---|---|---|---|
| HPSA | $20,151 | $18,353 | $19,478 | $19,543 |
| GmbH | 35,041 | 11,479 | 58,961 | 122,409 |
| VmbH | 9,866 | 7,102 | 14,866 | 14,462 |

In his statutory notice of deficiency, respondent disallowed the use of accelerated depreciation in computing the earnings and profits of HPSA, GmbH, and VmbH and decreased petitioner's claimed deductions by the above amounts.

*Issue 2. Minimum Overall Tax Burden Test*

For its taxable year ended October 31, 1968, petitioner elected to exclude HPSA's subpart F income from its own income by reason of the receipt of a "minimum distribution" with respect to the consolidated earnings and profits of its chain of controlled foreign corporations, as provided in section 963(a)(2). For purposes of computing the percentage of the earnings and profits of petitioner's chain of controlled foreign

corporations required to be distributed as the minimum distribution in accordance with section 963(b), the "effective foreign tax rate," as defined in section 963(d)(2), equaled or exceeded 47.38 percent.[3]

For petitioner's taxable year ended October 31, 1968, 83.3 percent of the days of that period were within the "surcharge period" referred to in section 963(b). The minimum distribution required under section 963(b)(1) for this portion within the surcharge period was zero percent of the earnings and profits of petitioner's chain of controlled foreign corporations because the effective foreign tax rate exceeded 47 percent.

For that portion of petitioner's taxable year ended in 1968 which was not within the surcharge period, the minimum distribution required under section 963(b)(3) was zero percent of the earnings and profits of petitioner's chain of controlled foreign corporations because the effective foreign tax rate exceeded 43 percent. Thus, for petitioner's entire taxable year ended October 31, 1968, the applicable minimum distribution requirement of section 963(a)(2), computed in accordance with section 963(b) but without reference to the "minimum overall tax burden" test prescribed by section 1.963-4(a), Income Tax Regs., was zero.

In the statutory notice of deficiency for petitioner's taxable year ended October 31, 1968, respondent determined that petitioner was not entitled to exclude from its gross income HPSA's subpart F income because petitioner did not satisfy the "minimum overall tax burden" test provided for by section 1.963-4(a), Income Tax Regs.

For the purpose of section 1.963-4(a)(1), Income Tax Regs., the "overall United States and foreign income tax," as defined in regulations section 1.963-4(a)(2)(ii), of petitioner's chain of controlled foreign corporations for its taxable year ended October 31, 1968, was $3,172,537. The consolidated (pretax) earnings and profits of petitioner's chain of controlled foreign corporations for its taxable year ended October 31, 1968, as referred to in section 1.963-4(a)(1)(i), Income Tax Regs., was $7,002,953.[4]

---

[3] If petitioner prevails on the accelerated depreciation election issue, the effective foreign tax rate will be higher than 47.38 percent, but this will have no bearing on the outcome of the minimum overall tax burden test issue.

[4] The parties disagree as to the amount of the earnings and profits of petitioner's

OPINION

## Issue 1. Accelerated Depreciation Election

We hold that petitioner made valid elections to make adjustments for accelerated depreciation in computing the earnings and profits of its foreign subsidiaries for the taxable years ended October 31 of 1964 through 1970. As we view the evidence, petitioner effectively committed itself to employ such method beginning with its return for the taxable year ended October 31, 1964, and continuing through the year ended October 31, 1970, and adequately informed the Internal Revenue Service that it elected to do so. We base our holding on an analysis of the general scheme for taxing the income of controlled foreign corporations, the provisions of the statute, the applicable regulations concerning the adoption and change of accounting methods, and the peculiar facts of this case.

The key operative provision of subpart F of Part III, subchapter N, chapter 1, of the Code is section 951, which requires the United States shareholders of a controlled foreign corporation (defined in section 957(a)) to include in their gross income their pro rata shares of such corporation's subpart F income (defined in section 952(a)) for any taxable year beginning after December 31, 1962. Section 952(c) limits, in general, a controlled foreign corporation's subpart F income for a taxable year to such corporation's earnings and profits for the taxable year. Therefore, in computing the controlled foreign corporation's subpart F income for any taxable year, it is necessary to determine the foreign corporation's earnings and profits for that year. Section 964(a) provides that:

For purposes of this subpart, the earnings and profits of any foreign corporation, and the deficit in earnings and profits of any foreign corporation, for any taxable year shall be determined according to rules

---

chain of controlled foreign corporations for the taxable year ended Oct. 31, 1968. This disagreement is the subject of the accelerated depreciation election issue. However, for the purpose of applying sec. 1.963–4(a)(1)(i), Income Tax Regs., and since the amount in disagreement is not sufficiently large to have a bearing on the outcome of the minimum overall tax burden test issue, the parties have agreed to regard the amount of $7,002,953 as the 1968 consolidated earnings and profits figure.

substantially similar to those applicable to domestic corporations, under regulations prescribed by the Secretary or his delegate.

The regulations under section 964(a) contemplate that the accounting methods employed by controlled foreign corporations will substantially conform with United States accounting practices for purposes of determining such corporations' earnings and profits. In order to effectuate such conformity, the regulations provide for various accounting and tax adjustments through the allowance of elections by the controlling domestic shareholders. One of the required adjustments, the one with which we are here concerned, is that depreciation must be computed in accordance with section 167 and the regulations thereunder. Sec. 1.964–1(c)(1)(iii), Income Tax Regs. In general, the controlling domestic shareholders are permitted to make any election which is allowed for domestic corporations. Sec. 1.964–1(c)(1)(iv), Income Tax Regs.

Section 1.964–1(c)(2), Income Tax Regs., provides, with respect to a controlled foreign corporation, an exception to the procedural requirements which domestic corporations must satisfy for an election to adopt or change a method of accounting. That subparagraph provides in pertinent part as follows:

(2) *Adoption of method.* For the first taxable year beginning after December 31, 1962, in which the foreign corporation is a controlled foreign corporation (within the meaning of section 957) or for which it is included in a chain or group under section 963(c)(2)(B) or (3)(B) * * * there may be adopted or made by such corporation or on its behalf any method of accounting or election allowable under this section notwithstanding that, in previous years, its earnings and profits were computed, or its books or financial statements prepared, on a different basis and notwithstanding that such election is required by the Code or regulations to be made in a prior taxable year. * * *

This transitional rule allows a qualifying foreign corporation to change its method of accounting in the first taxable year beginning after December 31, 1962 (hereinafter referred to as first post-1962 taxable year), without first securing the consent of the Commissioner. In other words, the foreign corporation is permitted to start with a clean slate in the first year in which it is covered by these provisions. Thus, any method of depreciation computation permissible under section 167 can be adopted for both new and used assets in the first

post-1962 taxable year, regardless of the method used theretofore for previously acquired assets.[5]

Normally, to elect to use one of the accelerated methods of depreciation specified in section 167(b)(2), (3), and (4) for a qualifying asset or group of assets, all a taxpayer has to do is compute the depreciation under the selected method for the taxable year "in which the property may first be depreciated by him." Sec. 1.167(c)–1(c), Income Tax Regs. However, section 1.964–1(c)(3),[6] Income Tax Regs., contemplates two added steps in making a depreciation accounting method election on behalf of a controlled foreign corporation in its first post-1962 taxable year. The first step, and the one on which this issue turns, is that the controlling United States shareholders should file a written statement, jointly executed by those shareholders, with the Director of International Operations, Internal Revenue Service, Washington, D.C. 20225,[7] within

---

[5] See Cook, "Problems in computing earnings and profits of a controlled foreign corporation," 25 J. Taxation 48 (July 1966); Weiss, "Application of American Accounting Methods To Foreign Operations: Government Objectives in Setting Up Accounting Requirements," 23d Ann. N.Y.U. Tax Inst. 981 (1965).

[6] Sec. 1.964–1 Determination of the earnings and profits of a foreign corporation.

(c) *Tax adjustments—* * * *

(3) *Action on behalf of corporation—*(i) *In general.* An election shall be deemed made, or an adoption or change in method of accounting deemed effectuated, on behalf of the foreign corporation only if its controlling United States shareholders (as defined in subparagraph (5) of this paragraph)—

(a) Satisfy for such corporation any requirements imposed by the Code or applicable regulations with respect to such election or such adoption or change in method, such as the filing of forms, the execution of consents, securing the permission of the Commissioner, or maintaining books and records in a particular manner,

(b) File the written statement described in subdivision (ii) of this subparagraph at the time and in the manner prescribed therein, and

(c) Provide the written notice required by subdivision (iii) of this subparagraph at the time and in the manner prescribed therein.

* * *

(ii) *Written statement.* The written statement required by subdivision (i) of this subparagraph shall be jointly executed by the controlling United States shareholders, shall be filed with the Director of International Operations, Internal Revenue Service, Washington, D.C., 20225, within 180 days after the close of the taxable year of the foreign corporation with respect to which the election is made or the adoption or change of method effected, or before May 1, 1965, whichever is later, and shall set forth the name and country of organization of the foreign corporation, the names, addresses, and stock interests of the controlling United States shareholders, the nature of the action taken, the names and addresses of all other United States shareholders notified of the election or adoption or change of method, and such other information as the Commissioner may by forms require.

[7] This requirement of the regulation was amended in 1974 to provide for filing the

180 days of the close of the taxable year of the foreign corporation with respect to which the election is made or the adoption or change of method effected, or before May 1, 1965, whichever is later. This written statement should set forth the name and country of organization of the foreign corporation, the names, addresses, and stock interests of the controlling United States shareholders, the nature of the action taken, the names and addresses of all other United States shareholders notified of the election or adoption or change of method, and such other information as the Commissioner may by forms require. Sec. 1.964–1(c)(3)(ii), Income Tax Regs.

The second step is that, before filing this written statement, the controlling United States shareholders should give written notice in a specified form of the election made or the adoption or change of method effected to all other persons known by them to be United States shareholders owning (within the meaning of section 958(a)) stock in the foreign corporation. Sec. 1.964–1(c)(3)(iii), Income Tax Regs. Since petitioner directly or indirectly owned all of the stock of the three foreign corporations here involved, this second step is not applicable in this case.

After the first post-1962 taxable year, an election on behalf of the controlled foreign corporation to adopt a method of depreciation accounting different from the one adopted for those assets (both new and used) in that year requires the consent of the Commissioner (see section 1.964–1(c)(3)(i)(a), Income Tax Regs.), plus the filing of the written statement described in section 1.964–1(c)(3)(i)(b) and (ii), Income Tax Regs., and the notification of other shareholders under regulations section 1.964–1(c)(3)(i)(c) and (iii).

In the instant case, subpart F was first applicable to petitioner for its taxable year ended October 31, 1964. Prior to that taxable year, petitioner had depreciated the assets of HPSA, GmbH, and VmbH on its books on a straight line basis. In its first post-1962 taxable year, petitioner changed from straight line depreciation to the double declining balance method of depreciation with respect to those corporations' depreciable assets on hand at the beginning of the taxable

written statement with the Director of the Internal Revenue Service Center, 11601 Roosevelt Blvd., Philadelphia, Pa. 19155. T.D. 7322, 1974–2 C.B. 216, 217.

year as well as to assets acquired by them during the taxable year and used the double declining balance method in computing the earnings and profits of those controlled foreign corporations. It is stipulated that commencing with the taxable year ended October 31, 1964, and continuing through the taxable year ended October 31, 1970, the earnings and profits of all three corporations reflected adjustments for accelerated depreciation.

Respondent contends that petitioner's election for the taxable year ended October 31, 1964, was invalid on the grounds that (1) the "written statement" filed by petitioner was not legally sufficient under section 1.964–1(c), Income Tax Regs., because it did not state in adequate detail what election the taxpayer was making, and (2) the "written statement" required by regulations section 1.964–1(c)(3)(ii) was filed with the District Director of Internal Revenue, San Francisco, Calif., rather than with the OIO in Washington, D.C. Respondent contends that as a result of petitioner's invalid election for the taxable year ended October 31, 1964, petitioner is not entitled to use the accelerated depreciation method of accounting for any assets, new or used, for the taxable years at issue herein. We disagree.

As noted above, petitioner was entitled, for purposes of choosing a method of depreciation, to treat previously acquired assets as newly acquired assets in the taxable year ended October 31, 1964.[8] To elect, on behalf of a foreign corporation, to use the accelerated depreciation method for those assets, both new and old, all petitioner had to do was compute depreciation under the selected method for this first post-1962 taxable year and fulfill the written statement directions of section 1.964–1(c)(3)(ii), Income Tax Regs.[9] Petitioner's return for the taxable year ended October 31, 1964, reflects that petitioner computed depreciation according to the double declining balance method. Thus, whether

---

[8] Although, for purposes of choosing a method of depreciation, previously acquired assets are treated as new assets in the first post-1962 taxable year, we express no opinion as to the basis from which depreciation is taken on these used assets. This is involved in the severed issue.

[9] Since petitioner was the sole shareholder of HPSA, GmbH, and VmbH at all times material herein, as explained above in the text, the notification requirement of sec. 1.964–1(c)(3)(iii), Income Tax Regs., although referred to in the discussion that follows, is technically not applicable.

petitioner validly elected to use the double declining balance method of depreciation for its first post-1962 taxable year depends on whether it complied sufficiently with the "written statement" directions of section 1.964–1(c)(3)(ii), Income Tax Regs.

It is true that petitioner did not literally comply with the "written statement" portions of the election provisions of section 1.964–1(c)(3), Income Tax Regs. Petitioner filed nothing with OIO, Washington, D.C., for its taxable year ended October 31, 1964. Rather, it attached a "written statement" to, and included other pertinent information elsewhere in, its income tax return for that year which it filed with the District Director of Internal Revenue, San Francisco, Calif.

However, literal compliance with the procedural directions in Treasury regulations on making elections, such as the "written statement" and place-of-filing provisions with which we are here concerned, is not always required. Repeatedly this Court has held elections effective where the taxpayer complied with the essential requirements of a regulation even though the taxpayer failed to comply with certain procedural directions therein. *Columbia Iron & Metal Co.,* 61 T.C. 5, 8–10 (1973) (copy of corporate minutes regarding a charitable contribution, filed subsequent to filing of return); *Alfred N. Hoffman,* 47 T.C. 218, 236–237 (1966), affd. per curiam 391 F.2d 930 (5th Cir. 1968) (imperfect revocation of a subchapter S election); *Fred J. Sperapani,* 42 T.C. 308, 330–333 (1964) (failure to follow procedural details in election of a proprietorship to be taxed as a corporation); *John P. Reaver,* 42 T.C. 72, 80–83 (1964) (election of installment reporting in an amended, rather than original, return); *Georgie S. Cary,* 41 T.C. 214 (1963) (information required, but furnished after return was filed, for election to treat a stock redemption as a dividend or an exchange). Although there exists no litmus test for determining whether literal compliance with a procedural regulation is called for, this Court in *Octavio J. Valdes,* 60 T.C. 910, 913 (1973), enumerated as follows certain factors which should be considered:[10]

---

[10] Respondent emphasizes that the regulations here involved are "legislative" in character in the sense that they were adopted pursuant to the specific delegation of authority contained in sec. 964(a), quoted above, and for this reason should be

In ascertaining whether a particular provision of a regulation stating how an election is to be made must be literally complied with, it is necessary to examine its purpose, its relationship to other provisions, the terms of the underlying statute, and the consequences of failure to comply with the provision in question. * * *

As to the legal sufficiency of petitioner's "written statement" filed with its income tax return for the taxable year ended October 31, 1964, quoted in pertinent part in our Findings, petitioner elected in this statement to determine the earnings and profits and the deficits in earnings of the foreign group according to the rules "substantially similar" to those applicable to domestic corporations. See sec. 1.964–1(a), Income Tax Regs. This statement standing alone was insufficient to notify respondent that an election to use accelerated depreciation was made or that petitioner was the sole shareholder of those foreign corporations on behalf of which the election was made. However, this statement, coupled with a schedule attached to the 1964 return, contains all the "written statement" information specified in section 1.964–1(c)(3), Income Tax Regs., quoted in part in footnote 6 above.

Page 3 of the schedule attached to the return for the October 31, 1964, taxable year is captioned "Information Required of U.S. Shareholders with income from Controlled Foreign Corporations—Announcement 64–122—Year ended 10/31/64," and it lists the foreign corporations for which the section 964 election was made. Included in the information provided in that schedule are the name and country of organization of HPSA, GmbH, and VmbH, and the stock interest (100 percent) of petitioner in each of those controlled foreign corporations.[11] The schedule prescribes the nature of the action taken as "Recast of Depr. 1964 Purchases from S.L. to 200% D.B. and Freight and Duty." From these entries in the 1964 return, it is clear (1) that petitioner was the sole United States shareholder of HPSA, GmbH, and VmbH, (2) that petitioner treated all assets of the controlled foreign

---

literally observed. The statute involved in each of the cases cited above in the text contains similar authorizations. Yet the Court in each of those cases rejected an argument that the taxpayer was required to comply literally with the procedural directions in the applicable regulation.

[11] This information is also provided in Form 2952 (entitled "Information Return by a Domestic Corporation with Respect to Controlled Foreign Corporations") and the statement of "Investments in Affiliates" filed with the return.

corporations as newly acquired in 1964, and (3) that petitioner elected for its first post-1962 taxable year to adopt the double declining balance method of depreciation. The return was filed within the time limit set for filing the written statement (i.e., "within 180 days after the close of the taxable year of the foreign corporation with respect to which the election is made * * * or before May 1, 1965, whichever is later"). Sec. 1.964–1(c)(3)(ii), Income Tax Regs.

We think the statement and material contained in the schedule referred to above, though not contained in a single document, substantially complied with the applicable regulation and thus were legally sufficient to constitute an election by petitioner. Petitioner obtained no advantage and caused respondent to suffer no inconvenience by failing to consolidate all the written statement data into a single document. Petitioner unequivocally committed itself to the double declining balance method of computing depreciation. If the shoe were on the other foot, respondent's position that petitioner had made an election not changeable without permission, sec. 1.964–1(c)(3)(i)(a), Income Tax Regs., would be unassailable.

We also think that, in view of the regulatory scheme, the consequences of imprecise compliance, and the peculiar facts of this case, literal compliance as to the place-of-filing direction was not necessary, and petitioner's filing of the statement and schedule with the District Director of Internal Revenue substantially complied with the applicable regulation. See *Octavio J. Valdes, supra* at 913–914. The purpose of having United States shareholders file a written statement with the OIO is reflected by section 1.964–1(c), Income Tax Regs., viewed in its entirety. Immediately following the recitation of the written statement and shareholder notification directions of subparagraph (3) of that regulation, section 1.964–1(c)(4),[12] Income Tax Regs., explains the effect which

---

[12] Sec. 1.964–1(c)(4), Income Tax Regs., provides in part as follows:

(4) *Effect of action by controlling United States shareholders.* Any action taken by the controlling United States shareholders on behalf of the foreign corporation pursuant to subparagraph (3) of this paragraph shall be reflected in the computation of the earnings and profits of such corporation under this section to the extent that it bears upon the tax liability of a United States shareholder who either—

(i) Was a controlling United States shareholder with respect to the action taken;

(ii) Received the written notice provided by subparagraph (3)(iii) of this paragraph;

(iii) Failed to file any of the returns required by section 6046 and the regulations

the controlling domestic shareholders' election on behalf of a controlled foreign corporation will have on certain United States shareholders. The stated purpose of regulations section 1.964–1(c)(4) is to require that the controlling shareholders' election or other action with respect to the computation of the controlled foreign corporation's earnings and profits be consistently reflected to the extent that it bears upon the tax liability of those United States shareholders who received actual notice of the election (or who have failed to provide respondent with the information necessary for their notification).

To the extent that the controlling United States shareholders are aware of other United States shareholders, respondent places the burden of notification upon the controlling shareholders. Sec. 1.964–1(c)(3)(iii), Income Tax Regs. But in order to assure notification to those other shareholders of whom the controlling shareholders are unaware, section 1.964–1(c)(3)(ii), Income Tax Regs., requires the controlling shareholders to file the written statement (which is to include a list of the shareholders notified of the election) with the OIO. Then, by comparing the names and addresses of the shareholders listed on the written statement to the shareholder list prepared from information on the Forms 959 required also to be filed with the OIO pursuant to section 6046 and the regulations thereunder,[13] the OIO is able to determine who the unnotified shareholders are and to provide them with exactly the same information as the controlling shareholders would have provided under section 1.964–1(c)(3)(iii), Income Tax Regs., had they been aware of such

thereunder within the period prescribed by section 6046(d); or

(iv) Was notified by the Director of International Operations of the action taken—

(a) Within 240 days after the close of the taxable year (of the foreign corporation) to which such action first relates, or

(b) Within 180 days after the close of the first taxable year in which such shareholder becomes a United States shareholder, or

(c) Before July 1, 1965, whichever is latest.

Subdiv. (iv) was amended in 1965 by T.D. 6829, 1965–2 C.B. 258, but such amendment was merely directory and does not change the thrust of the regulation.

[13] In 1974, pursuant to T.D. 7322, 1974–2 C.B. 216, 217, previously referred to in n. 7 above, the place of filing Forms 959 was changed from the Director of International Operations (OIO) to the "Internal Revenue Service Center designated in the instructions of the applicable form." Sec. 1.6046–1(j)(2), Income Tax Regs. The instructions of Form 959 designate the Philadelphia Service Center, the same place T.D. 7322 requires the written statement to be filed.

shareholders. Thus, the purpose of filing the written statement with the OIO becomes evident—to enable that office to give notice of the action taken to persons whose status as United States shareholders is established by the OIO's records but is unknown to the controlling United States shareholders.

In the instant case, during the taxable years ended October 31, 1964, through October 31, 1970, petitioner owned, directly or indirectly, 100 percent of the stock of HPSA, GmbH, and VmbH. There were no other shareholders of these controlled foreign corporations to be notified of petitioner's election. The failure to file the written statement with the proper office did not, under these circumstances, cause any prejudice to either party or to the essential purpose of section 1.964–1(c)(3)(ii) of the regulations. See *Octavio J. Valdes*, 60 T.C. at 913.

The responsibility of the Director of International Operations, in the context of this regulatory provision, moreover, is essentially a ministerial or clerical one, and his receipt of the written statements involves no audit functions.[14] Jurisdiction to audit a return filed with the proper District Director by a United States shareholder of a foreign corporation which has subpart F income remains lodged with that District Director. I.R. Manual 1118.4(1); compare I.R. Manual 1113.56, 1113.562, and 1113.563. Therefore, where the controlling shareholders fail to comply with the notice and written statement requirements, the audit function is nonetheless safeguarded by the controlling shareholders' required compliance with the existing statutory rules and regulations which attend such election.

---

[14] Respondent's brief summarizes the reasons for directing the filing of the written statements with the Director of International Operations as follows:

1. To afford the Office of International Operations (OIO), Internal Revenue Service, the opportunity to give notice of the action taken to persons whose status as United States shareholders is established by OIO's records but is unknown to the controlling United States shareholders.

2. To assure that a single earnings and profits figure for the controlled foreign corporation would be arrived at rather than different earnings and profits figures for each shareholder of the controlled foreign corporation.

3. To provide a central reference point for other shareholders and/or the Internal Revenue Service to determine if and when an election had been made or if an adoption or change of a method of accounting had been effectuated and from which to review and examine the nature and/or the sufficiency of an election made or the adoption or change of a method of accounting effectuated.

Thus, we think that petitioner, having validly elected to use double declining balance depreciation for its first post-1962 taxable year for newly acquired assets (as well as for the assets treated as newly acquired), was bound in subsequent years to that method for those assets, unless and until it received the consent of the Commissioner to change that method. For the reasons discussed above with respect to its taxable year ended October 31, 1964, we think that petitioner also substantially complied with the regulations in electing to use a method of accelerated depreciation for those assets newly acquired in each of its taxable years ended October 31 of 1965, 1966, and 1967. Therefore, the earnings and profits for 1967 of the three foreign subsidiaries should reflect the methods of depreciation elected for assets acquired in each of the taxable years ended October 31 of 1964, 1965, 1966, and 1967. And, finally, since the "written statement" directions of the regulations were fully complied with for the taxable years ended October 31 of 1968, 1969, and 1970, the sum of the years-digits method of accelerated depreciation for assets placed in service during those years may be used in computing the foreign subsidiaries' earnings and profits.[15]

In concluding that petitioner's failure to file a written statement with the OIO did not nullify its accelerated depreciation election, we do not purport to lay down any general rule which would undermine the regulatory direction that such statements be filed with that office. We confine our holding to the facts of this case. Petitioner's failure to file a written statement literally complying with the directions of the regulations was a mistake, but that mistake was not "to any degree attributable to any willful misconduct" by its officers or employees. *Edward F. Dixon*, 60 T.C. 802, 805 (1973). Petitioner had never filed any forms with the OIO on behalf of its foreign subsidiaries. Although its tax manager knew a written statement was to be filed, he was not aware that such statement was to be filed with the OIO.

Indeed, the regulations requiring the written statement to be filed with the OIO became final on October 27, 1964, only 4

---

[15] Since the issue as to the basis of the depreciated assets was severed for separate trial or settlement, the record contains few details as to the property owned by each of the controlled foreign corporations or as to the property on hand at the beginning of, or acquired during, each of the years before the Court.

days before the end of petitioner's first taxable year for which an election was to be made. T.D. 6764, 1964–2 C.B. 260, 265. Form 3646, requiring certain information from controlled corporations, was not in existence when petitioner filed its return for the taxable year ended October 31, 1964. Failure to comply with all the directions of the regulations caused no prejudice to the Internal Revenue Service, and since petitioner owned, directly or indirectly, all the foreign subsidiaries' stock, literal compliance would not have served any useful purpose. As soon as petitioner's tax manager learned during 1968 that written statements were to be filed with the OIO, he thereafter filed them with that office as directed by the regulations. Therefore, we think petitioner made a good-faith effort to comply with the applicable regulations. See *Bell Fibre Products Corp.*, 65 T.C. 753, 764–765 (1976).

Finally, the regulations do not contemplate that they will be given the harsh literal reading here advocated by respondent. The failure of the controlling United States shareholder to provide notice of an election to a person required to be notified under the regulations does not invalidate the election made "if it is established to the satisfaction of the Commissioner that reasonable cause existed for such failure." Sec. 1.964–1(c)(3)(iii), Income Tax Regs. Further, if failure to take any action within the prescribed time period required in making an election is "shown to the satisfaction of the Commissioner to be due to inadvertence or a reasonable cause," the Commissioner may specify a later date for compliance. Sec. 1.964–1(c)(6), Income Tax Regs. Thus, mere inadvertence is sufficient to excuse a taxpayer's failure to timely take all the steps required for a valid election.

Since we have concluded, in the light of the facts of this case, that petitioner's returns and accompanying statements and schedule, filed with the District Director of Internal Revenue, substantially complied with the directions of the regulations, these "escape" provisions are technically inapplicable. However, they serve to demonstrate that reason is to reign in applying the regulations. The written statement and place-of-filing directions are not intended to be traps for the unknowing. Rather, they are intended only to contribute to the effective administration of section 964, and in the

circumstances of this case, the form and content of the materials filed with the District Director served that purpose.

*Issue 2. Minimum Overall Tax Burden Test*

Section 963 permits a United States corporate shareholder to avoid a tax on its subpart F income where a timely election to take such exclusion was made and where certain prescribed standards of minimum distributions of earnings and profits to that shareholder were met.[16] The purpose of this provision is to relieve the United States shareholder of any tax with respect to the foreign subsidiary's undistributed income in those cases where the combined foreign tax and United States tax (to the extent the latter is paid on distributed income) is not substantially below the United States corporate tax rate. S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 794. Thus, as the effective foreign tax rate increases, the required minimum distribution of earnings and profits by the foreign subsidiary decreases. S. Rept. No. 1881, *supra*, 1962–3 C.B. at 794–795; see tables in sec. 963(b). To qualify for this relief, however, a corporation is required under section 963(a)[17] to consent in its election to "all the regulations prescribed by the Secretary or his delegate under this section."

For its taxable year ended October 31, 1968, petitioner made a timely election under section 963. As reflected in our Findings, the foreign tax rate was sufficient to eliminate the necessity of any distribution in order to meet the minimum distribution requirements of section 963(b). There remains,

---

[16] Sec. 963 was repealed by sec. 602(a)(1) of Pub. L. 94–12 (Mar. 29, 1975), 89 Stat. 58, effective (sec. 602(f) of Pub. L. 94–12, 89 Stat. 64) for taxable years of foreign corporations beginning after Dec. 31, 1975, and for taxable years of U.S. shareholders within which or with which such taxable years of such foreign corporations end.

[17] SEC. 963. RECEIPT OF MINIMUM DISTRIBUTIONS BY DOMESTIC CORPORATIONS.

(a) GENERAL RULE.—In the case of a United States shareholder which is a domestic corporation and which consents to all the regulations prescribed by the Secretary or his delegate under this section prior to the last day prescribed by law for filing its return of the tax imposed by this chapter for the taxable year, no amount shall be included in gross income under section 951(a)(1)(A)(i) for the taxable year with respect to the subpart F income of a controlled foreign corporation, if—

(1) in the case of a controlled foreign corporation described in subsection (c)(1), the United States shareholder receives a minimum distribution of the earnings and profits for the taxable year of such controlled foreign corporation;

however, the issue as to whether the "minimum overall tax burden" test prescribed by section 1.963–4(a), Income Tax Regs., to which petitioner consented, has also been met.

This separate and additional test prescribed by regulations section 1.963–4(a) is to be met by a chain or group of corporations, as in the case of HPSA and its subsidiaries, GmbH and VmbH.[18] It deals with the problem not covered by the express language of section 963, of a United States corporate shareholder receiving grossly unequal distributions from the members of a chain or group of controlled foreign corporations. The amount of such distributions could be arranged so as to take advantage of the varying foreign tax rates in the foreign countries involved and yet still satisfy the minimum distribution test. Allowance of such a practice would have distorted the balance contemplated by section 963 between the percentage of creditable foreign taxes and the percentage of earnings and profits required to be distributed.[19]

The means adopted to solve this problem was to require the actual overall foreign and United States tax burden on the earnings of a chain or group to be 90 percent of the tax which would have been imposed if those earnings and profits had been fully subject to United States taxation. If the overall burden was less than required, the United States shareholder might increase the distributions it received until the mini-

---

[18] This regulation was promulgated under sec. 963(f), which provides in part that the Secretary of the Treasury—

shall prescribe such regulations as he may deem necessary to carry out the provisions of this section, including regulations for the determination of the amount of foreign tax credit in the case of distributions with respect to the earnings and profits of two or more foreign corporations.

[19] In its brief, petitioner presents the following example which illustrates the problem of non-pro rata distributions from members of a chain or group of controlled foreign corporations to a U.S. corporate shareholder:

"if in 1966 two controlled foreign corporations had equal pre-tax earnings but were subject to effective tax rates of 30 percent and 50 percent respectively, the effective foreign tax rate would have been 40 percent. This rate would have been the basis for determining the minimum distribution under Code section 963(b), in this hypothetical case 37 percent. If the foreign corporation taxed at 50 percent had distributed 75 percent of its earnings, the test would have been satisfied. But the United States would have received no taxes because of the 50 percent foreign tax credit. If the distribution had been pro rata, the United States would have collected tax on the half distributed from the corporation taxed at 30 percent."

mum overall tax burden was met. Thus, the purpose of the "minimum overall tax burden" test was to insure that the relief granted by the "minimum distribution" provisions of section 963 was not abused by non-pro rata distributions.

The regulation (sec. 1.963–4(a)(1)(i)) provides that no exclusion should be allowed unless the overall United States and foreign income tax for the taxable year with respect to which the distribution is made equals or exceeds 90 percent of an amount determined by multiplying the sum of the consolidated earnings and profits and the consolidated foreign income taxes of the chain or group of corporations for the taxable year "by a percentage which equals the sum of the normal tax rate and the surtax rate (determined without regard to the surtax exemption) prescribed by section 11 for the taxable year of the shareholder." The issue is narrowed to whether the surcharge imposed by section 51 is added to this percentage for petitioner's taxable year ended October 31, 1968.

Petitioner contends that, since the surcharge rate was imposed by section 51 rather than section 11, only the normal tax rate and the surtax rate prescribed by section 11, without regard for the surcharge rate prescribed by section 51(a)(2), is multiplied by the consolidated earnings and profits ($7,002,953) of petitioner's chain of controlled foreign corporations. Ninety percent of the resulting amount ($3,361,417) is $3,025,276. Since this amount is less than the overall United States and foreign income tax ($3,172,537), petitioner maintains that it satisfied the test and is entitled to exclude HPSA's subpart F income pursuant to section 963.

Respondent contends that, in applying the "minimum overall tax burden" test of regulations section 1.963–4(a)(1)(i), the surcharge rate prescribed by section 51(a)(2) is added to the normal tax rate and the surtax rate prescribed by section 11, and the total is multiplied by the consolidated (pretax) earnings and profits ($7,002,953) of petitioner's chain of controlled foreign corporations.[20] The result is $3,641,536, and

---

[20] For the calendar year 1968, sec. 51(a)(1)(B) imposed a surcharge on corporations equal generally to 10 percent of their tax liability without regard to the surcharge. Sec. 51(a)(2)(A) provided that the surcharge would be allocated for fiscal years according to the number of days falling in the surcharge period. For petitioner's taxable year ended Oct. 31, 1968, 83.3 percent of the days of that fiscal year were

90 percent of this amount is $3,277,382. Since this latter amount is greater than the overall United States and foreign income tax ($3,172,537), respondent contends that petitioner did not satisfy the test and is not entitled to exclude HPSA's subpart F income pursuant to section 963. We agree with respondent.

Section 51, added to the Internal Revenue Code by section 102(a) of the Act of June 28, 1968, Pub. L. 90–364, 82 Stat. 251, imposed a surcharge on the income of individuals, estates and trusts, and corporations. Section 51(a)(1)(B) imposed on the income of every corporation a tax computed as a percentage of the adjusted tax (as defined in section 51(b)) in addition to the other taxes imposed by chapter 1 of the Code. For corporations, the surcharge was applicable for taxable years ended after December 31, 1967, and beginning before July 1, 1970. Sec. 51; sec. 1.51–1(c)(2), Income Tax Regs. The stated purpose for the surcharge on the tax liabilities of business corporations was to dampen inflationary pressures and keep the economy under control. H. Rept. No. 91–413 (Part 1), 91st Cong., 1st Sess. (1969), 1969–3 C.B. 200, 309. The section was not expected or intended to be a permanent addition to the Code.

When the surcharge was added to the Code in 1968, the "minimum distribution" provisions of section 963 were amended to reflect this original enactment. Sec. 102(b) of Act of June 28, 1968, Pub. L. 90–364, 82 Stat. 255. Subsequently, every time the surcharge was extended, section 963 was amended to take into account such extensions. Sec. 5(b) of Act of Aug. 7, 1969, Pub. L. 91–53, 83 Stat. 95; sec. 701(b) of Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 659. Thus, Congress expressly recognized the relationship between section 51 and the "minimum distribution" provisions of section 963.

Moreover, section 51(f) laid down the general rule that the surcharge rate, where attributable to another tax-imposing section of chapter 1 of the Code, should be considered as emanating from such other section. That section reads as follows:

---

within the surcharge period. As a result, the applicable surcharge rate was 4 percent (.48 × .10 × .833 = .039984).

For purposes of this title, to the extent the tax imposed by this section is attributable (under regulations prescribed by the Secretary or his delegate) to a tax imposed by another section of this chapter, such tax shall be deemed to be imposed by such other section.

Consistent with section 51(f), section 1.51–1(h)(1), Income Tax Regs., in part as follows, was adopted to provide that—

to the extent the tax imposed by section 51 is attributable to a tax imposed by another section of chapter 1 of the Code, such tax shall be deemed to be imposed by such other section. For example, if the only tax (other than the surcharge) imposed under chapter 1 of the Code to which a particular corporation is subject is the tax imposed by section 11, then the surcharge imposed on such corporation shall be deemed to be imposed by section 11.
* * *

Thus, section 51(f) and this implementing regulation have the effect of treating the section 51 surcharge as imposed by section 11.

Therefore, we do not believe that it can be disputed that Congress fully intended that during the surcharge period, the surcharge rate should apply to section 963 and to any regulations promulgated thereunder. To hold otherwise would allow the erosion of the "minimum distribution" provisions of section 963, which the "minimum overall tax burden" test of the regulations was designed to prevent. No requirements less stringent than those of section 963(b) could be applied if section 1.963–4(a), Income Tax Regs., is to serve its intended purpose.

In reaching this conclusion, we are applying the same commonsense interpretation to regulations section 1.963–4(a) as we have applied in the discussion of the accelerated depreciation election issue, above. The objective of this regulation section could not be achieved by reading it in isolation even though, as emphasized by petitioner, it is legislative in character. This section must be read in the light of section 51(f) and its implementing regulation which make it clear that the section 51 surcharge is to be deemed to have been imposed by section 11. While it might have been technically more elegant for the Commissioner to have amended section 1.963–4(a), Income Tax Regs., to refer to the temporary section 51 surcharge while it was in effect, we think it was permissible to achieve the same result by promulgating the general provision of section 1.51–1(h)(1), Income Tax Regs., quoted in pertinent part above.

Since the surcharge rate imposed by section 51(a)(1)(B) must be added to the normal tax rate and surtax rate imposed by section 11 of chapter 1 of the Internal Revenue Code for that part of petitioner's taxable year within the surcharge period, petitioner failed to satisfy the "minimum overall tax burden" test prescribed by section 1.963–4(a), Income Tax Regs., and is not entitled to exclude from gross income for the taxable year ended October 31, 1968, the subpart F income of HPSA.

The parties will be expected to file an appropriate motion in respect of the further handling of the severed issue.

*An appropriate order will be issued.*