LYLE A. AND FLORENCE WHITNEY CHAPMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DURANT FOUNDRY AND MACHINE CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chapman v. Commissioner
Docket Nos. 3434-78, 3435-78.[1]
United States Tax Court
T.C. Memo 1982-307; 1982 Tax Ct. Memo LEXIS 441; 44 T.C.M. (CCH) 35; T.C.M. (RIA) 82307; June 3, 1982. Lyle A. Chapman, pro se. Robert M. Fowler, *442 for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge:* Respondent determined deficiencies and additions to tax in petitioners' Federal income taxes for 1973 and 1974 as follows: Lyle A. and Florence Whitney Chapman (Chapmans) Year
Deficiency
Sec. 6653 (a) [2]
1973
$ 42,319.03
$ 2,115.95
1974
15,847.26
792.36
Durant Fountry and Machine Co. (Durant) Year
Deficiency
Sec. 6653 (a)
1973
$ 33,464.41
$ 1,673.22
1974
4,021.34
201.06
After concessions by the parties, the issues remaining for decision are (1) whether the Chapmans failed to report in 1973 wage income of $ 30,000; (2) whether the Chapmans received dividend income from Durant in 1973 and 1974; (3) whether respondent abused his discretion in requiring *443 Durant to change its method of accounting from cash basis to accrual; (4) whether respondent properly adjusted the ending 1973/beginning 1974 inventory of Durant to reflect a metals purchase made in 1973; and (5) whether petitioners are liable for additions to tax in 1973 and 1974 under section 6653(a). FINDINGS OF FACT Lyle A. Chapman and Florence Whitney Chapman
Petitioners Lyle A. Chapman and Florence Whitney Chapman resided in Durant, Iowa, when they filed their petition herein. Mr. Chapman was president and majority shareholder of Durant Foundry and Machine Co. during the years in issue. Durant issued and delivered three checks, totalling $ 30,000, to Mr. Chapman as wages in 1973. Durant then claimed a deduction of $ 30,000 on its corporate return for that year as compensation paid to Mr. Chapman. Although Mr. Chapman received the checks in 1973, the record is not clear as to when he cashed them. However, he did not report the $ 30,000 as wage income in that year. Sometime in 1973, Durant sought to invest $ 150,000, which it held in a certificate of deposit, in common stock. Mr. Chapman, as president, was advised that Durant could not legally invest those *444 monies in common stocks. Consequently, Durant cashed the certificate of deposit and transferred the monies to Mr. Chapman's personal account. Durant characterized this transaction on its books as an interest free loan to Mr. Chapman. Mr. Chapman subsequently invested the loan proceeds in various common stocks. At the time of trial, Mr. Chapman had paid down the original $ 150,000 loan balance to $ 43,800. Upon the advice of an accounting firm, Durant declared dividends payable to Mr. Chapman of $ 32,100 in 1973 and $ 14,500 in 1974. Also upon the advice of the accounting firm, Mr. Chapman applied these dividends against his outstanding loan balance with Durant. The Chapmans reported the dividends received by Mr. Chapman from Durant in 1973 on their joint return for that year. [3] They did not report the 1974 dividends on their joint return for that year. The Internal Revenue Service began an examination of the Chapmans' *445 1973 income tax return in 1974.The examining agent told the Chapmans that he would challenge their method of reporting the dividends which Durant had declared in 1973. [4] Mr. Chapman told the agent that since no money had actually changed hands between him and Durant, he would erase [5] the declared dividends from the books and would restore the loan to its original balance so as to avoid respondent's unexpected challenge. The agent did not inform Mr. Chapman that he could not undo the challenged transaction by making compensating book entries. During the years in issue, the Chapmans drove their personally-owned truck in the course of Durant's business. Mrs. Chapman kept weekly records of the expenditures and the mileage they incurred when operating the truck for Durant. She gave these records to Mr. Chapman each week, and he would total the expenses and mileage figures before recording the totals on a sheet *446 which he kept for that purpose. In this manner, he determined that he and his wife spent 20.35 cents per mile operating their truck for Durant. [6]
The Chapmans also operated a truck owned by Durant in the course of Durant's business. The record does not show the amount of the expenses the Chapmans incurred when operating that truck for Durant. Durant Foundry and Machine Co.
Durant was a corporation doing business in Iowa at the time it filed its petition herein. During the years in issue, it was a cash basis taxpayer and had so reported its income since 1957. Durant made aluminum castings to order following customer specifications. *447 It kept inventories of aluminum ingot which did not exceed a one-month supply because: (1) its sales of castings did not vary significantly month to month; (2) it had limited storage space, and the capital cost of carrying inventory was high; and, (3) it used ingot of different specifications for each order. Generally, Durant would monthly consume its entire aluminum ingot inventory by making and selling castings. During 1973, Durant purchased metals as follows: February 6, 1973
$ 666.45
June 26, 1973
646.03
July 27, 1973
832.51
August 6, 1973
11,123.43
October 25, 1973
1,219.75
November 20, 1973
286.00
December 24, 1973 [7]
13,718.64
Total
$ 28,492.81
It also made two additional metals purchases of approximately $ 9,150 each. However, the record does not show when these purchases were made. Durant's sales for the first eight four-week periods in 1973 were approximately $ 16,000; $ 17,000; $ 17,000; $ 18,000; $ 18,000; $ 18,000; *448 $ 18,000; and $ 19,000, respectively. Its sales for the last four-week period of 1973 was $ 19,634. At the beginning of 1973, Durant had inventories valued at $ 8,500. At the end of 1974, Durant had inventories valued at $ 7,444. Since Durant made all of its sales on credit, it also had accounts receivable. At the beginning of 1973, its accounts receivable were $ 29,644, at the beginning of 1974, they were $ 27,655.61, and at the end of 1974, they were $ 63,532. OPINION Lyle A. Chapman and Florence Whitney Chapman
1. 1973 Wage Income from Durant
The parties have stipulated that Durant paid Mr. Chapman wages of $ 30,000 in 1973 by signing and delivering to him, in 1973, three checks totalling $ 30,000. The record shows that Mr. Chapman did not believe checks were taxable income until he cashed them. Although the record is not conclusive, it also appears that Mr. Chapman did not negotiate these checks in the year in which he received them. In any event, Mr. Chapman did not report the $ 30,000 as wages during 1973, although Durant deducted the $ 30,000 as wages paid. As a general rule, *449 checks are considered income during the year in which they are received. This is true whether or not they are cashed during the year. There are limited exceptions to this rule if the issuer is insolvent or if there are substantial restrictions on the check's current negotiability. See, e.g., Lavery v. Commissioner,158 F.2d 859 (7th Cir. 1946), affg. 5 T.C. 1283 (1945); Kahler v. Commissioner,18 T.C. 31 (1952). Here, there is no evidence that either of these exceptions apply. Durant was not insolvent and there were no limits on the negotiability of the checks. Thus, the checks totalling $ 30,000 which Mr. Chapman received in 1973 from Durant were income in 1973 whether or not he cashed the checks in 1973. Accordingly, respondent's determination that the Chapmans had $ 30,000 additional wage income in 1973 will be sustained. 2. Dividend Income in 1973 and 1974
The Chapmans concede that Durant declared dividends in 1973 and 1974, albeit upon the faulty advice of an accountant. They also agree that, initially, Mr. Chapman applied the amount of the dividends against the balance of Durant's $ 150,000 loan to Mr. Chapman. *450 However, they point out that the substance of the transactions was a series of offsetting book entries in which no money physically changed hands. Thus, they argue that since Mr. Chapman "erased" the dividends and restored the loan to its pre-dividend balance, the purported tax consequences of the original transactions should be disregarded. We sympathize with the Chapmans' frustrations at having received faulty advice from their accountant. Moreover, we understand that when no hard cash has passed between hands, it can appear inequitable to treat an easily-reversed book entry as having particular tax consequences. However, the Chapmans chose to operate their business in the corporate form. They must accept the consequences of Durant's corporate existence. See Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943). One consequence is that a shareholder has taxable income when he receives a dividend. Sections 301(c), 316.This consequence is not altered by the fact that Durant did not pay Mr. Chapman's dividends in cash. Mr. Chapman constructively received the *451 dividends because he was able to apply them against his outstanding personal loan balance with Durant.See, e.g., Roe v. Commissioner,192 F.2d 398 (5th Cir. 1951); Bush Brothers & Co. v. Commissioner,73 T.C. 424 (1979), affd. 668 F.2d 252 (6th Cir. 1982). Nor is the consequence altered by the fact that Mr. Chapman effectively returned the monies to Durant by changing its book entries. When a dividend has been declared and paid, it is income to the recipient shareholder. This is true even if the recipient shareholder immediately restores the amounts he has received to the distributing company pursuant to a prior agreement, by his own initiative, or upon request of the issuing board of directors. See Crellin's Estate v. Commissioner,203 F.2d 812 (9th Cir. 1953), cert. denied 346 U.S. 873 (1953); Soreng v. Commissioner,158 F.2d 340 (7th Cir. 1946); Barnhardt v. United States,98 F. Supp. 552 (D. N.C. 1951); Swanson v. Commissioner,2 B.T.A. 1112 (1925). Thus, we find that the Chapmans received dividend income from Durant in 1973 and 1974. Respondent's *452 determination on this issue will be sustained. 3. Deduction for Truck Mileage Expenses
In 1973 and 1974, the Chapmans drove their own truck, as well as a truck owned by Durant, in the course of Durant's business. They incurred various expenses in operating their own truck. Durant reimbursed them for these expenses at a rate per mile which exceeded the rate then allowed by the respondent, [8] and petitioners included such reimbursement in income. Respondent contends that the Chapmans are not entitled to deduct the excess amount because they did not introduce documentary evidence showing that their expenses per mile equalled or exceeded the rate at which they were reimbursed. The Chapmans have the burden of showing error in respondent's determination. *453 Rule 142(a). [9] We find that they have satisfied their burden of proof in this case. The transcript of Mr. Chapman's testimony shows him to be forthright and credible.He brought with him figures and gave precise testimony as to events and costs relating to the operation of his own truck. Moreover, his testimony was based upon weekly records that he and his wife maintained. [10] While we agree that the production of documentary evidence would have been desirable, [11] we have no cause to disbelieve the figures Mr. Chapman presented. [12] Moreover, it is evident from the transcript that the Chapmans were unaware that respondent sought particularized documentary substantiation of the truck mileage expenses, and that they would have produced for him adequate records prior to trial had he requested them. From these facts, we hold that the Chapmans are entitled to a mileage deduction of 20.35 cents per mile for those miles they drove their own truck on Durant's business in 1973 and 1974. *454 Respondent also challenged the Chapmans' mileage deduction in excess of the standard rate with respect to their business operation of a truck owned by Durant. The Chapmans did not produce documentary or testimonial evidence to support a deduction in excess of the standard rate. Mr. Chapman's testimony related only to the costs of operating his own truck. Because the Chapmans have failed to produce evidence from which we can determine their expenses of operating Durant's truck, they have failed to meet their burden of proof on this point. Rule 142(a). Accordingly, respondent's determination is sustained with respect to the operation of Durant's truck. 4. Negligence
Respondent asserts that the Chapmans are liable for additions to tax under section 6653(a) in 1973 and 1974 because they failed to report $ 30,000 of wage income in 1973 and $ 14,500 of dividend income in 1974. We disagree. By the time of the trial, Mr. Chapman had forgotten why he failed to report, in 1973, the $ 30,000 he received from Durant. However, his incomplete present recollection does not show that he was negligent in 1973. The record shows that Mr. Chapman was under the mistaken belief that *455 a check is not income until it is cashed. Moreover, his uncontradicted testimony established that, as a matter of habit, he often deferred cashing checks from Durant to help its financial position. We believe that Mr. Chapman failed to cash the checks in 1973 and failed to report them under his honest belief that they were not yet income. Nevertheless, he caused Durant to report, in 1973, the wage income it had paid him. This left a trail to Mr. Chapman which does not comport with intentional disregard of income tax rules and regulations. We are also not convinced that the Chapmans' failure to report dividend income in 1974 was due to negligence. They initially caused this corporation to declare the dividends pursuant to wrongful advice from their accountant. Their later attempts to undo the unanticipated effects of the declaration were fully disclosed to respondent. These attempts were executed in the good faith belief that a transaction executed only on paper could be completely reversed by book-keeping entries. Under the aforementioned circumstances, we find that the Chapmans are not liable for an addition to tax under section 6653(a). Durant Foundry and Machine Co.
*456 1. Change in Method of Accounting
Durant has reported its income on the cash receipts and disbursements method since 1957, although it has inventories and accounts receivable. Respondent has several times audited Durant's returns without requiring it to change its accounting method. Respondent now asserts that Durant should report its income using the accrual method. Section 1.446-1(a)(4)(i), Income Tax Regs., provides that a taxpayer who is involved in the production, purchase, or sale of merchandise must account for merchandise on hand at the beginning and end of each year, so as to compute properly taxable income for each year. The regulation further provides that such merchandise is to be acounted for under the methods of computing inventories provided in sections 471 and 472, and the regulations thereunder. Following the regulations under section 446, it becomes apparent that it is necessary for Durant to use inventories. As stated in section 1.471-1, Income Tax Regs. *457 : In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. [Emphasis added.] Thus, because Durant is involved in the purchase, production, and sale of merchandise, it must use inventories. [13] Accordingly, under section 1.446-1(c)(2)(i), Durant must use the accrual method of accounting to report its purchases and sales unless it can show that it has been otherwise authorized by respondent. Section 1.446-1(c)(2)(i), Income Tax Regs.
Durant stresses that it has reported its income on the cash receipts and disbursements method since 1957 and that respondent has several times *458 audited its returns without requiring it to change its method. Durant argues, in effect, that respondent's past acceptance of its cash basis accounting constitutes authorization of that method. Unfortunately for Durant, the case law is otherwise. Respondent's acceptance of Durant's cash basis accounting in earlier years does not constitute authorization of Durant's method of accounting. Caldwell v. Commissioner,202 F.2d 112, 115 (2d Cir. 1953), affg. a Memorandum Opinion of this Court; Ezo Products Co. v. Commissioner,37 T.C. 385 (1961). Moreover, respondent's failure to object to Durant's method of accounting does not estop him from later challenging that method. Niles Bement Pond Co. v. United States,281 U.S. 357 (1930); Caldwell v. Commissioner,supra.Although Durant's surprise at respondent's challenge to its accounting method is understandable, it is not unusual for respondent to make such belated challenges. As has been stated in the past: The record shows that the taxpayers have consistently used the * * * system of accounting of which the Commissioner now complains. * * * Nevertheless, *459 the fact that the Commissioner accepted taxpayers' previous returns upon a cash basis without objection does not preclude him from computing the tax on the returns here involved upon an accrual basis. Iverson's Estate v. Commissioner,supra at 5. We are, thus, constrained to hold that respondent may require Durant to change to the accrual method even though he accepted Durant's cash basis method of accounting in the past. Accordingly, respondent's determination with respect to Durant's method of accounting will be sustained. 2. Durant's Inventory Ending 1973/Beginning 1974
On December 14, 1973, U.S. Reduction Company shipped aluminum ingot to Durant. On December 24, 1973, Durant paid U.S. Reduction $ 13,718.64 for the metal. [14] However, Durant reported its ending 1973/beginning 1974 inventory value as only $ 6,500. In the notice of deficiency, respondent adjusted this reported inventory figure to reflect Durant's December 1973 metals purchase from U.S. Reduction Company. Durant argues that respondent should not have *460 added any part of the metals purchase from U.S. Reduction Company to its ending 1973/beginning 1974 inventory. It claims that it had a consistent pattern of purchases and sales. In particular, Durant's president testified that Durant would monthly use up all of the ingot it had purchased. Moreover, his uncontradicted testimony showed that the company did not have space to store more than a month's supply of ingot and could not afford capital costs and carrying charges of a greater supply. Thus, Durant maintains that the metal it purchased in December from U.S. Reduction must have been used before year's end 1973, consistent with its pattern of use. Respondent insists that Durant could not have cast and sold ingot worth approximately $ 13,700 in two weeks. He points out that Durant's beginning inventory and check spreads show that the company could have consumed ingot worth only $ 10,644.99. during the first seven months of 1973. [15] In that same period, it had total sales of approximately $ 122,000. To contrast, during the last four weeks of 1973, it made a metals purchase of $ 13,718.64. Its total sales for those four weeks were only $ 19,634. Respondent claims that this *461 discrepancy between Durant's sales and purchases for the first seven months and for the last four weeks of 1973 demonstrates that Durant could not have cast and sold approximately $ 13,700 worth of aluminum ingot in two weeks. Durant asserts that respondent's list of its metals purchases for 1973 is incomplete. It maintains that it made two additional metals purchases of approximately $ 9,150 each. Thus, Durant contends that respondent improperly analyzed its monthly purchases and sales, and erroneously concluded that Durant could not have consumed the metals purchased from U.S. Reduction in two weeks.
The parties have stipulated that Durant made two metals purchases in the amounts claimed by Durant. However, the stipulation does not show whether these purchases were made in 1972 or 1973. Moreover, there is no evidence as to the months in which these purchases were made. Durant asserts that respondent has copies of its records for these purchases, including cancelled checks. Thus, *462 Durant argues that respondent should have considered them as metals purchased and used in 1973. Unfortunately, these records were not introduced into evidence by either party through documentation or testimony. Because we do not have any evidence from Durant demonstrating when the additional metals purchases occurred, we must accept respondent's determination that Durant made only seven metals purchases in 1973. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent's list of Durant's metals purchases for 1973, when compared with Durant's monthly sales, is compelling evidence that the company did not use the ingot purchased in December from U.S. Reduction Co. before the end of 1973. The transcript of Mr. Chapman's testimony relating to Durant's general pattern of metals consumption was credible. Nonetheless, it was circumstantial evidence which, in this case, was too weak to overcome the presumptive correctness of respondent's determination. See Welch v. Helvering,supra.Accordingly, we find that an adjustment to Durant's ending 1973/beginning 1974 inventory to reflect the metals purchase from U.S. Reduction Co. is proper. *463 Respondent's determination will be sustained. 3. Negligence
Respondent contends that Durant is liable for an addition to tax under section 6653(a) because it maintained its records in poor condition. We find respondent to be overzealous. The exhibits of Durant's check spreads are carefully and clearly prepared. The testimony of Durant's president, Mr. Chapman, demonstrated that he maintained thorough records of the business and had a detailed memory for much of Durant's operations. The review of Durant's records for 1973 and 1974 by Durant's accountants for 1977 through 1979, showed that it had overstated, rather than understated, its income for those years using the cash receipts and disbursements method. Finally, there is no evidence that respondent has previously objected to Durant's manner of recordkeeping, although he has audited Durant's returns several times in the past. These facts demonstrate that Durant is not liable for an addition to tax under section 6653(a) due to negligence. Decisions will be entered under Rule 155.
Footnotes
1. These cases have been consolidated for purposes of trial briefing, and opinion.↩
*. These cases were tried before Judge Cynthia Holcomb Hall, who subsequently resigned from the Court. By order of the Chief Judge dated February 8, 1982, the cases were reassigned to Judge Perry Shields↩ for disposition.
2. All section references are to the Internal Revenue Code of 1954, as amended during the years in issue, unless otherwise indicated.↩
3. They now contend, in their petition and in a letter to respondent dated July 19, 1974, that they should not have reported these monies as dividends in 1973. Accordingly, they maintain that they overreported their income and are entitled to a refund.↩
4. The substance, of the agent's objections was not apparent from the record. ↩
5. From the evidence before us, we are uncertain whether this event was literal or figurative. It is not clear that the initial dividend transactions were ever recorded in Durant's books.↩
6. The Chapmans brought to the trial the various expense figures for their operation of their truck in the course of Durant's business. The cost per mile of operating their truck was as follows: depreciation, 9.08 cents; gasoline, 5.08 cents; tires, 1.21 cents; insurance, 1.07 cents; repairs, 2.43 cents; oil and lubrication,.76 cents; and tolls,.72 cents. At trial, Mr. Chapman stated that their operating cost per mile totalled 20.95 cents. However, based upon the itemized costs, we find that the operating costs were 20.35 cents per mile.↩
7. Durant paid U.S. Reduction Co. on December 24, 1973, for ingot which was shipped from Alabama on December 14, 1973. The record does not show when the ingot arrived, or whether Durant paid for it before it arrived.↩
8. In 1973, the standard mileage rate for business use of a car was 12 cents per mile for 15,000 miles, and 9 cents per mile thereafter. Rev. Proc. 70-25, 1970-2 C.B. 506. In 1974, the rates were 15 cents per mile for 15,000 miles, and 10 cents per mile thereafter. Rev. Proc. 74-23, 1974-2 C.B. 476↩.
9. All rule references are to the Tax Court Rules of Practice and Procedure.↩
10. See Frankel v. Commissioner,T.C. Memo. 1968-168↩. 11. See Stewart v. Commissioner,T.C. Memo. 1976-390↩.
12. Sec. 1.274-5(c)(2), Income Tax Regs., requires that travel expenses away from home be substantiated by adequate records, such as an account book, diary, or statement of expense. However, it requires that expenses of transportation away from home be supported by documentary evidence only where readily available. Sec. 1.274-5(c)(2)(iii)(b), Income Tax Regs. Moreover, it does not apply at all to local transportation expenses. See, e.g., Cobb v. Commissioner,77 T.C. 1096, 1101↩ (1981). Respondent does not contest that Mr. Chapman kept statements of expense, nor does he dispute that Mr. Chapman testified with particularity as to the contents of these expense statements. Thus, petitioners have adequately substantiated their away from home truck mileage expenses, as well as their local truck mileage expenses.
13. For other discussions relating to inventory accounting and the accrual method see, e.g., Iverson's Estate v. Commissioner,255 F.2d 1 (8th Cir. 1958), affg. 27 T.C. 786 (1957), cert. denied 358 U.S. 893 (1958); Primo Pants Company v. Commissioner, 78 T.C.     (filed April 26, 1982); Ezo Products Co. v. Commissioner,37 T.C. 385↩ (1961).
14. The record does not show when the ingot arrived at Durant's factory.↩
15. Durant's beginning 1973 inventory was $ 8,500. It made metals purchases totalling $ 2,144.99 between January 1, 1973, and July 27, 1973. The sum of $ 8,500 and $ 2,144.99 is $ 10,644.99.↩