**BUSH BROTHERS AND COMPANY,**
**Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL**
**REVENUE, Respondent-Appellee.**

**No. 80–1158.**

United States Court of Appeals,
Sixth Circuit.

Argued June 5, 1981.

Decided Jan. 8, 1982.

W. W. Davis, Jr., W. W. Davis, Knoxville, Tenn., for petitioner-appellant.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert Andrews, Tax Division, U. S. Dept. of Justice, N. Jerold Cohen, Chief Counsel, I. R. S., G. Rothenberg, Washington, D. C., for respondent-appellee.

Before EDWARDS, Chief Judge, and WEICK and MERRITT, Circuit Judges.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

This case is an appeal from a divided Tax Court.[1] In an original and a concurring opinion (with five judges dissenting), the Tax Court held that certain dividends in kind represented by bills of sale for quantities of navy beans issued to all the shareholders of this closely held family corpora-

---

1. *Bush Bros. & Co. v. Comm'r*, 73 T.C. 424 (1979) (Bruce, J.); *id.* at 439 (Tannenwald, J., concurring); *id.* (Quealy, J., dissenting without opinion); *id.* at 440 (Chabot, J., dissenting); *id.* at 443 (Nims, J., dissenting).

tion, and in most instances promptly sold, resulted in income to the corporation declaring the dividends, as well as to the stockholders who received them. Judge Bruce, who wrote the opinion for the court, set out the facts as follows:

> Petitioner Bush Bros. & Co. is a corporate continuation of a proprietorship founded by A. J. Bush in 1897. For each of the FYE April 30, 1972, through April 30, 1974, petitioner timely filed a Federal corporate income tax return with the Internal Revenue Service Center, Memphis, Tenn., using the accrual method of accounting, which it still employs.... [P]etitioner operates a food processing and canning business involving various produce items, including navy beans which are used to make both pork and beans and baked beans.... During the time in question, petitioner had over 50 shareholders all of whom were Bush family members, related in some way to one of the six children of the founder A. J. Bush. No one stockholder and no one of the six family branches owned controlling stock in petitioner. The largest branch holding was approximately 31 percent, which was spread among the 20 members of the H. C. Bush family. However, the older members of each branch were either officers or directors of petitioner.

> One such person, key to the instant case, is C. J. Ethier (C.J.). C.J., a member of the Bush family by marriage, was both a director and the president of petitioner during the years in question. He was required to know the day-to-day movements of the navy bean market. Well regarded for his knowledge in the area, C.J., along with employee Fred Hammand (Hammand), negotiated many of the navy bean acquisitions for petitioner.

> Acquisition of navy beans for production was a relatively consistent process. If successful, the negotiations conducted by C.J. or Hammand with either Grant L. Kuhn Co., Michigan Elevator Co., J. P. Burroughs Co., or Michigan Bean, would result in "open contracts" between petitioner and those suppliers. Petitioner made no distinction, at that time, between contracts for use as dividends and contracts for use in production. Although these "open contracts" specified quantity and quality and fixed the price as of the agreement date, they remained executory or "open" as to shipping date.... The buyer could usually demand shipment any time within the designated period or pay storage costs if the period had passed without shipment....

> Due to the uncertainty of production needs and the volatile nature of the price of navy beans, such theoretically possible year-round supplies were not necessarily desirable. Instead, there were two basic approaches to supply in the industry. One approach was to contract for beans for immediate delivery as production needs arose. Another approach was to contract for beans in large amounts, usually at lower prices, for shipment in the reasonably predictable future. This was referred to as maintaining a long position by forward buying. Petitioner chose this latter approach....

> \* \* \* \* \* \*

> After sufficient open contracts for a particular period were committed, petitioner, through C.J., would select the order of contract shipment. This order did not necessarily follow the chronology of the respective agreements. Instead, C.J. would select contracts for shipment relative to the shipment designations and a number of other business reasons.

> \* \* \* \* \* \*

> From time to time, petitioner would also select and pay for certain open contracts, not for delivery and production, but for distribution as dividends in kind. In all, nine such dividends were made during the period of October 1970 through March 1976. Pertinent facts of the five in issue here are set forth below:

| Dividend Number | Declaration date | Distribution date | Cost per hundred weight (CWT) | Fair market value reported | Sales dates | Sales prices |
|---|---|---|---|---|---|---|
| 1 | 4/20/71 | 6/15/71 | $ 7.45 | $14.75 | 6/21—8/9/71 | $15.10—$16.25 |
| 2 | 2/16/72 | 3/15/72 | 11.25 | 14.00 | 3/15/72 | 14.00 |
| 3 | 5/16/73 | 6/15/73 | 9.35 | 19.50 | 6/15/73 | 19.50 |
| 4 | 6/14/73 | 6/25/73 | 9.35 | 19.50 | 6/25—6/26/73 | 19.50 |
| 5 | 11/14/73 | 11/16/73 | 10.25 | 40.00 | 11/19—12/14/73 | 40.00—43.00 |

Although some differences existed, all of the dividends in issue were of navy beans from Michigan Bean and followed the same general pattern. Recommendation for a dividend in kind came from C. J. His reasons were always related to the natural hazard of open contracts in excess of production demands, experienced whenever using a forward buying policy to meet unpredictable demand. . . . Regardless of the reason given for the excess, the record shows that each recommendation of C. J. for a dividend in kind from excess open contracts was unquestioned, resulting in an immediate, unanimous declaration of dividend by the board of directors.

Upon declaration of the dividend, payment checks and a list of shareholder-names were sent to Michigan Bean. In return, Michigan Bean issued a warehouse receipt to petitioner. The beans remained in Michigan Bean's elevators. Thus, shareholders were not physically given navy beans. Instead, bills of sale for appropriate amounts of beans were distributed. Each bill of sale conveniently contained a preprinted assignment clause by which each shareholder could assign his bean dividend merely by filling in the assignee name and then signing the assignment. It appeared as follows:

## ASSIGNMENT

For value received the undersigned hereby sells, assigns, transfers and conveys to _____ all of the undersigned's right, title and interest in or to the above attached Bill of Sale and does hereby irrevocably constitute and appoint Michigan Bean Division to make delivery of said beans described therein to such assignee.

_____ (stockholder)

Although a simple document, the assignment clause was not always completed properly with the purchaser's name. . . . [T]he beans were invariably sold back to Michigan Bean. Therefore, the blank spaces in the assignments caused no confusion in the implementation of the transaction.

Having been sold and then repurchased in a rapid sequence of events, the beans were never physically moved during this period. Yet, *these same beans were always sold at a price higher than the original open contract price and*, with the exception of No. 1 and No. 5, *the entire transaction from distribution to sale was completed in only 1 day.* While the assignment clauses were executed individually, contact with Michigan Bean for the sale details was made through phone calls by the elder members of the respective family branches. In this way, these "family leaders," *most of whom were also officers or directors of petitioner,* could make single calls for a number of shareholders. Although some time may have been saved by such group calls, no record of prior negotiations between the shareholders and Michigan Bean was provided to explain how even these transactions could have all been completed in 1 day. Further, both the fact that petitioner was even engaged in the sale of raw navy beans, and the existence of dividend-related negotiations between petitioner and Michigan Bean were categorically denied. However, *Michigan Bean sent sales confirmations for dividends No. 1 and No. 2 to petitioner,* but sent them to the individual shareholders for dividends No. 3, No. 4, and No. 5, at the request of C. J.

*Bush Brothers & Co. v. Commissioner,* 73 T.C. 424, 425–31 (1979) (footnotes omitted) (emphasis added).

Finally, Judge Bruce held:

Petitioner claims to have used dividends in kind for the business purpose of reducing its excess supply of beans. However, we find it incredible that petitioner, in business for almost eighty years, would have miscalculated its needs so often and with increasing frequency as time passed. Further, more beans were purchased soon after each such dividend. Surely petitioner would not have purchased more beans while being overstocked. Therefore, we believe that petitioner was attracted to the use of dividends in kind primarily as a tax avoidance device and not for any substantive business purpose. *United States v. Lynch,* [192 F.2d 718, 720 (9th Cir. 1951), *cert. denied,* 343 U.S. 934 [72 S.Ct. 770, 96 L.Ed. 1342 (1952)]; *Southern Bancorporation v. Commissioner,* [67 T.C. 1022, 1027 (1977)].

73 T.C. at 437.

Judge Tannenwald, joined by five other judges in his concurring opinion, appears to have relied upon the facts that C. J. Ethier, the president of the company who functioned according to this record as head of the family, made the recommendations for the bean dividends and that his recommendations resulted in immediate and unanimous declarations of the dividends by the Board of Directors. In addition, these transactions in navy beans never resulted in a single bean moving in any direction. At all times the beans were in storage in the Michigan Bean Division of Wickes Corporation warehouse in Michigan. All that the shareholders received were bills of sale with a pre-printed assignment clause by which the bean dividend could be assigned merely by filling in the assignee's name and signing the form.

Finally, the beans were always sold back to the Michigan Bean Division of Wickes Corporation which owned them in the first place, and the recommendations for sale were made by C. J. Ethier.

On these facts, Judge Tannenwald, joined by five other judges in his concurring opinion, held, "I believe that petitioner [Bush Brothers and Company] participated sufficiently in the sales that the profits therefrom should be imputed to it." *Id.* at 440.

We recognize, of course, as appellant Bush Brothers contends, that § 311(a) of the Internal Revenue Code provides after certain exceptions that "no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of . . . property." Nonetheless, it is established tax law that § 311(a), enacted in 1954, was not designed to invalidate *Commissioner v. Court Holding Co.,* 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945), or the comparable dicta in *United States v. Cumberland Public Service Co.,* 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 257 (1950).[2] These cases either directly or by dicta impute income to successful, as opposed to liquidating, corporations that have sought to avoid taxes by making sham dividends.

We agree with Judge Tannenwald and those who joined his opinion that the taxpayer, Bush Brothers & Company, through its president, C. J. Ethier, participated actively in initiating, arranging and carrying out these transactions and that, under settled tax law, the Tax Court was correct in holding that the profits were taxable to appellant company because they were sham dividends.

For these reasons, the judgment of the Tax Court is affirmed.

---

**2.** *See Hines v. United States,* 477 F.2d 1063, 1068 (5th Cir. 1973).