AMERICAN AIR FILTER COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2252–81, 21800–81.     Filed October 12, 1983.

---

*John S. Nolan* and *Victor Thuronyi*, for the petitioner.
*Richard E. Trogolo*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in the petitioner's Federal income taxes:

| Taxable year ended | Deficiency |
|---|---|
| Oct. 31, 1974 | $601,634.68 |
| Oct. 31, 1977 | 1,399,920.00 |
| Oct. 2, 1978 | 452,058.00 |

After concessions by the parties, the issues remaining for decision are: (1) Whether the petitioner, American Air Filter Co., Inc., effectively elected to receive minimum distributions from two of its foreign subsidiaries for 1974 pursuant to section 963 of the Internal Revenue Code of 1954[1]; (2) if so, whether the petitioner effectively elected the 180-day distribution period (sec. 1.963–3(g)(2), Income Tax Regs.) for such year; (3) whether a distribution which American Air Filter received

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue. Sec. 963 was repealed in 1975 (sec. 602(a), Tax Reduction Act of 1975, Pub. L. 94–12, 89 Stat. 26), effective generally for taxable years beginning after Dec. 31, 1975.

from AAF-International, S.A., on April 14, 1975, was "made" within the distribution period as required by section 1.963–3(c)(1), (g), Income Tax Regs.; (4) whether AAF-International Finance, N.V., realized a loss in 1974 upon its conversion of a liability payable in foreign currency into one payable in U.S. dollars; (5) whether reasonable cause exists to permit the petitioner to receive a deficiency distribution to satisfy its 1974 minimum distribution requirements (sec. 1.963–3(b)(1)(iii), Income Tax Regs.); and (6) whether reasonable cause exists to permit the petitioner to modify its group election for 1975 and 1976 and receive deficiency distributions for such years on a chain basis (sec. 1.963–1(c)(3)(ii), Income Tax Regs.).

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, American Air Filter Co., Inc. (AAF), is a corporation organized under the laws of Delaware with its principal office in Louisville, Ky., at the time it filed its petitions in this case. AAF timely filed its Federal corporate income tax returns for its taxable years ended October 31, 1974, 1975, 1976, and 1977, and October 2, 1978, with the Internal Revenue Service Center, Memphis, Tenn. A taxable year shall be identified by the calendar year in which it ended.

During the years in issue, AAF was a global concern with subsidiaries throughout the world. In such years, AAF had at least 22 foreign subsidiaries, including AAF-International, S.A. (Int), a wholly owned Swiss subsidiary whose taxable year ended on September 30, AAF-International Finance, N.V. (Intfin), a wholly owned Netherlands Antilles subsidiary whose taxable year ended on October 31, and AAF-Ltd. (Great Britain) (AAF-UK), a wholly owned United Kingdom subsidiary whose taxable year also ended on October 31. AAF and its subsidiaries were accrual method taxpayers.

AAF first elected to exclude the subpart F income of its controlled foreign corporations, pursuant to the minimum distribution rules of section 963, for its 1964 taxable year. AAF filed written statements electing to receive minimum distributions for 1964 through 1973 and for 1975 and 1976. Lewis Schloemer was the officer of AAF who was in charge of AAF's tax department. Mr. Schloemer and AAF's other officers

intended to file a written section 963 election with the 1974 return. In its request for an extension of time to file its 1974 return, dated April 8, 1975, and filed with AAF's 1974 return, AAF stated that the extension was necessary in part to collect "the information required with respect to the income from controlled foreign corporations, and the related computations of a minimum distribution." Believing that section 963 had been elected, AAF's officers included on AAF's 1974 return the following payments which AAF received in 1975:

| Payor | Date received | Amount |
|-------|---------------|--------|
| Int | Apr. 14, 1975 | $995,000 |
| Intfin | June 10, 1975 | 247,000 |

These payments represented the amounts of the required first-tier distribution from Int and Intfin under the circumstances as the officers of AAF then believed them to be. No amount was included on AAF's 1974 return as subpart F income of Int or Intfin.

Because of an oversight on the part of AAF's officers, employees, and accountants, no written election statement was filed with AAF's 1974 return. Mr. Schloemer was unaware of this omission until after the Commissioner commenced an audit of AAF's 1974 return. Agent Schaller, who conducted the audit, told Mr. Schloemer that no election statement had been filed with the 1974 return. When Mr. Schloemer could not find a file copy of the statement, he had one prepared showing the election which Mr. Schloemer thought AAF had made. He submitted this document to Agent Schaller.

AAF filed information returns for each of its foreign subsidiaries with its 1974 return. Such information returns consisted of 22 Forms 3646, Income from Controlled Foreign Corporation, and 22 Forms 2952, Information Return with Respect to Controlled Foreign Corporations. All the Forms 3646, including those filed for Int and Intfin, stated that no section 963 election had been made. Such statements on the forms for Int and Intfin were erroneous and were due to carelessness in the preparation and review of the forms. Other portions of the Forms 3646 were completed in a manner inconsistent with the negative answer concerning the section 963 election.

Minimum distributions were to be made within 60 days after the close of the controlled foreign corporation's taxable year

unless the parent elected an extended 180-day period. Sec. 1.963–3(g), Income Tax Regs. Such an election was to be filed with the parent's return. AAF expressly elected the 180-day period on the minimum distribution election statements filed with its 1964, 1965, and 1966 returns. AAF did not expressly elect the 180-day distribution period on its returns for 1967 through 1973, but the Commissioner, who audited the returns for such years, did not challenge AAF's use of the 180-day period. The proper amount of the minimum distribution could not be determined without the information contained on the financial statements of Int and Intfin. Such information was not available within 60 days after the close of Int's taxable year on September 30 or Intfin's on October 31. AAF received the minimum distributions for 1969, 1970, and 1971 in February or March of the following year.

Int's board of directors consisted of Jesse M. Shaver, chairman, who was also president and chairman of the board of AAF, and two members of the Swiss management firm which handled Int's legal affairs. On March 17, 1975, Int's board of directors declared a dividend of 2,500,000 Swiss francs. This amount was the Swiss franc equivalent of $995,000, the dividend which AAF's management believed to be due from Int under the minimum distribution election. On April 14, 1975, Int paid the dividend by transferring funds to AAF's New York bank account. The method and timing of the dividend payment was determined by officers and employees of AAF, including the treasurer, Robert Timmerman, and his subordinate, J. Scott Brogdon. The dividend could have been paid at any time after March 17, 1975.

Intfin was responsible for securing financing for AAF's international operations. On about October 18, 1971, Intfin entered into an agreement with an unrelated lender, Societe Financiere Europeenne (SFE), whereby SFE agreed to extend a loan commitment of $3,750,000. The loan proceeds were to be invested in the working capital or fixed facilities of AAF's foreign subsidiaries. Intfin borrowed the full amount of the loan commitment in Swiss francs of 14,900,000. The loan was repayable in the same number of Swiss francs, with interest, regardless of the U.S. dollar equivalent on the dates of payment, in three equal annual installments, due in 1977, 1978, and 1979.

The agreement provided that the loan could be converted to a different currency at the borrower's request, provided that the lender agreed that the requested replacement currency was "available, freely convertible and transferable." Intfin could request such a conversion on any "revision date," which occurred at 6-month intervals after the date of the initial borrowing, until January 15, 1974. Having several different currencies available to it allowed Intfin to match the currency borrowed with the currency of the country of investment and thereby minimize the risk of foreign exchange loss.

The loan agreement originally provided that, to effect a conversion, Intfin had to repay the loan in the old currency on the same day that the new currency was drawn down. This provision was modified on October 4, 1973. The modification provided that SFE would loan Intfin an amount of the new currency sufficient to cover SFE's purchase of sufficient old currency to discharge the old currency obligation.

On April 27, 1973, when the U.S. dollar equivalent of the Swiss franc loan was $4,618,634, Intfin made a principal payment of 2,916,000 Swiss francs, or approximately 19.57 percent of the outstanding debt. In determining Intfin's earnings and profits for 1973, the Commissioner allowed Intfin a loss of $168,150 resulting from the partial repayment. Also on April 27, 1973, at Intfin's request, the balance of the loan was replaced by a loan in Netherlands guilders.

On May 1, 1974, the guilders loan was converted into a loan of $4,242,962, which was the U.S. dollar value of the guilders loan on such date. Neither AAF nor Intfin made principal payments during 1974. After May 1, 1974, there were no further conversions of the loan into other currencies. The U.S. dollar value of the loan on May 1, 1974, exceeded 80.43 percent of the original dollar value of the loan by $1,226,855. Without accounting for any loss on the SFE loan, Intfin had net income before tax of $373,517.

In March 1975, Mr. Schloemer and AAF's tax counsel prepared a letter to the Director of the Internal Revenue Service Center in Philadelphia electing the completed contract method of accounting for Int's long-term contracts. The election was to be effective for Int's 1974 taxable year. The letter was mailed, but the Philadelphia Service Center did not receive it, perhaps due to an error in the zip code. Mr.

Schloemer believed that AAF had validly elected to use the completed contract method of accounting for Int's long-term contracts. AAF computed Int's 1974 earnings and profits using the completed contract method and, in turn, used such earnings and profits to determine the amount of Int's 1974 minimum distribution to be $995,000. The Commissioner computed Int's 1974 earnings and profits using the percentage of completion method of accounting for long-term contracts, resulting in an increase of the required minimum distribution for 1974 to $1,744,855.

AAF elected to receive its section 963 minimum distributions for 1975 and 1976 on a group basis because its computations showed that the earnings and profits and foreign taxes of the controlled foreign corporations in the group were such that the minimum distribution would be zero in each year. The Commissioner made adjustments to the foreign taxes and the earnings and profits of the controlled foreign corporations in the group which are not contested by AAF. One of the Commissioner's adjustments concerned AAF-UK's 1975 and 1976 British tax liabilities.

In 1975, the United Kingdom enacted a measure of corporate tax relief providing for a 1-year tax deferral, computed by a statutory formula. United Kingdom Finance Act (No. 2) 1975, ch. 45, sched. 10, par.6(2). The statutory mechanism provided for an automatic recapture ("clawback") of the deferred tax in 1976. In 1976, the deferral was extended at least another year, and the clawback provisions were made more complex so that AAF-UK could not be certain whether all of the deferred tax would be "clawed back" in 1977. United Kingdom Finance Act 1976, ch. 40, sched. 5, part I, pars. 10(1) and (2), 12(1). The deferral was ultimately made permanent in 1979. United Kingdom Finance Act (No. 2) 1979, ch. 47, sched. 3, par. 3. AAF-UK paid no United Kingdom taxes in 1975 or 1976, yet it accrued $796,713 in U.K. taxes for 1975 and $1,001,412 in U.K. taxes for 1976, pursuant to the certified audit reports provided by AAF's accountants, Peat, Marwick, Mitchell & Co. The Commissioner adjusted AAF-UK's 1975 and 1976 British taxes to reflect the fact that no taxes were paid for those years.

In his notice of deficiency for 1974, the Commissioner determined that AAF had not elected section 963 for that year.

Accordingly, he included Int and Intfin's subpart F income in AAF's income for 1974. The Commissioner also determined that the $995,000 distribution which AAF received from Int in 1975 was includable in AAF's income for that year, not for 1974. The Commissioner did not allow Intfin any loss sustained on the 1974 foreign currency loan conversion. Since the Commissioner determined that AAF had not elected section 963 for 1974, he did not consider the availability of the deficiency distribution procedures for such year. The Commissioner's determination of a deficiency for 1977 was almost entirely due to his adjustments for 1975 and 1976, which eliminated net operating loss carryforwards that AAF had used in 1977. AAF does not contest the correctness of the Commissioner's adjustments for 1975 and 1976; the only issue remaining with respect to such years is whether, given the Commissioner's adjustments, AAF may modify its original section 963 elections for such years. The Commissioner's determination of deficiency for 1978 was not petitioned and is not before the Court.

## OPINION

Foreign source income earned by foreign subsidiaries of domestic corporations is generally not subject to U.S. taxation until it is repatriated. Secs. 881, 882; *Dave Fischbein Manufacturing Co. v. Commissioner*, 59 T.C. 338, 353 (1972); S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 703, 784; B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 17.30 (1979 ed.). However, section 951, enacted in 1962 as part of subpart F (secs. 951–964) provides that a U.S. shareholder of a controlled foreign corporation must include in income its pro rata share of the controlled foreign corporation's "subpart F" income (section 952), whether or not such income is actually distributed to the shareholder. In general, subpart F income includes certain income from sales of goods between related persons, income from the performance of services for related persons, passive investment income, income from the insurance of U.S. risks, and certain other items. Secs. 952, 954, 999. Subpart F was designed to eliminate use of tax havens in specified circumstances. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 461–462; *Garlock, Inc. v. Commissioner*, 58 T.C. 423, 433

(1972), affd. 489 F.2d 197 (2d Cir. 1973); *General Electric Co. v. United States*, 221 Ct. Cl. 771, 610 F.2d 730 (1979).

Section 963 was intended to provide relief to U.S. shareholders in circumstances where Congress considered that the shareholder was not deriving an undue tax advantage from the use of a tax haven. S. Rept. 1881, *supra*, 1962–3 C.B. at 794–796, 969–976. Until its repeal, section 963 provided that a U.S. shareholder could elect to exclude from income its share of the subpart F income of one or more of its controlled foreign corporations if it received a minimum distribution of the earnings and profits of the controlled foreign corporation in an amount sufficient to insure that the combined foreign and U.S. tax rate on the earnings and profits approximated the rate at which such earnings would have been taxed if they were subject to U.S. taxation. S. Rept. 1881, *supra*, 1962–3 C.B. at 969; sec. 1.963–1(a)(1), Income Tax Regs. The amount of the minimum distribution was expressed as a percentage of the earnings and profits of one or more controlled foreign corporations; statutory tables provided that the percentage of earnings and profits which must be distributed increased as the applicable foreign tax rate decreased. Sec. 963(b). The U.S. shareholder must elect section 963 for each year for which the shareholder seeks to exclude subpart F income. Sec. 1.963–1(c)(3), Income Tax Regs.

The subsidiary corporations whose subpart F income is to be excluded, as well as the amount of the minimum distribution itself, may be determined by any of three methods. The first, and simplest, method is known as a "first-tier" minimum distribution. Sec. 1.963–1(d), Income Tax Regs. The amount of the minimum distribution received from a single directly owned foreign subsidiary is determined by reference to that subsidiary's earnings and profits and foreign taxes. Receipt of the required minimum distribution entitles the U.S. shareholder to exclude the subsidiary's subpart F income. Sec. 963(a)(1). First-tier elections may be made with respect to more than one foreign subsidiary (sec. 1.963–1(d), Income Tax Regs.); each computation is separate, and each corporation whose subpart F income is excluded must itself pay the minimum distribution.

The second method is a "chain" minimum distribution, whereby a U.S. shareholder may elect to exclude the subpart F

income of one or more chains of controlled foreign corporations. Sec. 963(a)(2), (c)(2). A chain consists of one first-tier foreign corporation and one or more lower-tier foreign corporations, the stock of which is indirectly owned by the U.S. shareholder by reason of its ownership of the stock of the first-tier corporation. Sec. 963(c)(2)(A) and (B); sec. 1.963–1(e), Income Tax Regs.; see W. Gifford, Controlled Foreign Corporations—Section 963, 105–3d Tax Management Portfolio A-7 (1975). The amount of the minimum distribution is determined with reference to the consolidated earnings and profits and foreign taxes of the corporations in the chain, and receipt of the required amount from the chain permits the U.S. shareholder to exclude the subpart F income of all the controlled foreign corporations in the chain.

The third method is a "group" election. Sec. 963(a)(3), (c)(3); sec. 1.963–1(f), Income Tax Regs. The minimum distribution is computed with reference to the consolidated earnings and profits and foreign taxes of all the U.S. shareholders' direct and indirect foreign subsidiaries (with exceptions not relevant herein). As with the chain method, receipt of the required minimum distribution from the group permits the U.S. shareholder to exclude the subpart F income of each controlled foreign corporation in the group.

The first issue for decision is whether the petitioner effectively elected to receive minimum distributions for 1974 from Int and Intfin pursuant to section 963. The petitioner contends that it substantially complied with the requirements for a valid section 963 election. The Commissioner asserts that the petitioner, having failed to file the timely election statement required by section 1.963–1(c)(2), Income Tax Regs., is not entitled to the section 963 exclusion for 1974.

Section 963(a) permitted the exclusion if the shareholder received the required minimum distribution and consented to the regulations prescribed pursuant to the authority granted to the Commissioner by section 963(f). Such regulations provided that the U.S. shareholder was required to elect the exclusion for a taxable year, at or prior to the time that its tax return for such year was due, by filing with the return a written statement declaring that a section 963 election was made for the taxable year and furnishing the names of the corporations to which the election applied, as well as certain

information concerning the earnings and profits and foreign tax of each such corporation. Sec. 1.963–1(a)(2), (c)(2), Income Tax Regs.

After reviewing the record, we have concluded that the petitioner's officers intended to elect section 963 for 1974 and believed that they had done so. The petitioner intended to receive first-tier minimum distributions from Int and Intfin with respect to 1974. The petitioner included the distributions received from Int and Intfin during 1975 on its 1974 return, and it did not include any amount as subpart F income of Int and Intfin on its 1974 return. However, no election statement was filed with the petitioner's 1974 return; it was not until Agent Schaller informed the petitioner's officers of this omission that the petitioner's officers submitted an election statement for 1974.

The Commissioner "may insist upon full compliance with his regulations" (*Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 296 (1945)) when the regulatory requirements relate to the substance or essence of a statute (see *Penn-Dixie Steel Corp. v. Commissioner*, 69 T.C. 837 (1978); *Dunavant v. Commissioner*, 63 T.C. 316 (1974); *Thorrez v. Commissioner*, 31 T.C. 655 (1958), affd. per curiam 272 F.2d 945 (6th Cir. 1959)), but we have held that substantial compliance with regulatory requirements may suffice when such requirements are procedural and when the essential statutory purposes have been fulfilled. *Taylor v. Commissioner*, 67 T.C. 1071 (1977); *Hewlett-Packard Co. v. Commissioner*, 67 T.C. 736 (1977); *Columbia Iron & Metal Co. v. Commissioner*, 61 T.C. 5 (1973); *Dougherty v. Commissioner*, 60 T.C. 917 (1973), supplemental opinion 61 T.C. 719 (1974); *Hoffman v. Commissioner*, 47 T.C. 218 (1966), affd. per curiam 391 F.2d 930 (5th Cir. 1968); *Cary v. Commissioner*, 41 T.C. 214 (1963). Several factors have been examined in determining whether to permit less-than-literal compliance with regulatory requirements: whether the taxpayer's failure to comply fully defeats the purpose of the statute; whether the taxpayer attempts to benefit from hindsight by adopting a position inconsistent with his original action or omission; whether the Commissioner is prejudiced by the untimely election; whether the sanction imposed on the taxpayer for the failure is excessive and out of proportion to the default; and whether the regulation provided with detailed

specificity the manner in which an election was to be made. See, e.g., *Taylor v. Commissioner, supra; Columbia Iron & Metal Co. v. Commissioner, supra; Denman Tire & Rubber Co. v. Commissioner,* 14 T.C. 706 (1950), affd. 192 F.2d 261 (6th Cir. 1951).

The Commissioner relies upon *Dunavant v. Commissioner, supra,* and *Penn-Dixie Steel Corp. v. Commissioner, supra,* in support of his argument that the petitioner's failure to file the election statement goes to the essence of the statute. In *Dunavant,* shareholders seeking nonrecognition of gain on corporate liquidating distributions pursuant to section 333 failed to file elections required by that section. We held that such failure precluded the taxpayers' use of section 333, since elections were necessary to determine whether section 333 could be used at all and to identify the shareholders receiving nonrecognition treatment. See also *Posey v. United States,* 449 F.2d 228 (5th Cir. 1971). In *Penn-Dixie Steel Corp.,* the taxpayer sought to elect the rapid amortization of pollution control facilities pursuant to section 169, but did not file with its return proof that Federal certification of such facilities had been obtained or applied for, as required by regulation. This Court stated that "While the actual filing of a copy of the required certification or application therefor may be a procedural detail, the implicit requirement that such an application must have been made goes to the very essence of the statute." 69 T.C. at 846.

Both *Dunavant* and *Penn-Dixie Steel Corp.* are distinguishable from the present case. Here, the petitioner fulfilled the essential purpose of section 963; it received distributions from Int and Intfin in amounts which it believed to be sufficient to be first-tier minimum distributions, and it included such amounts on its 1974 return in lieu of any subpart F income.[2] Through inadvertence, the petitioner did not file the election

---

[2]The fact that the distributions may not have been made in the proper amounts or received within the proper periods is, in the present case, irrelevant in determining whether the petitioner substantially complied with the requirements *to elect* sec. 963. The failure to receive the full distribution within the proper time may be rectified in appropriate circumstances by a deficiency distribution if there has been a valid sec. 963 election. See sec. 963(e)(2). If receipt of the proper distributions within the proper time were a prerequisite for a valid *election,* then the deficiency distribution provisions would be superfluous. Therefore, in the present case, substantial compliance refers to the requirements for *electing* the use of sec. 963 and not to the requirements for excluding subpart F income pursuant to sec. 963.

statement with its 1974 return, but the statement was submitted to the Commissioner's agent when the omission was discovered. Under similar circumstances, we permitted a taxpayer to treat a stock redemption as a sale pursuant to section 302(b)(3) although she did not file the required waiver of family attribution agreement with her original return. *Cary v. Commissioner, supra.* Filing the statement merely confirmed the election which had been made in substance (*Tipps v. Commissioner,* 74 T.C. 458 (1980); *Taylor v. Commissioner, supra; Sperapani v. Commissioner,* 42 T.C. 308 (1964)); and to preclude the petitioner's use of section 963 because of its delay in filing the election statement would punish the petitioner inordinately for a clerical omission (see *Columbia Iron & Metal Co. v. Commissioner, supra*).

Moreover, the petitioner is not now adopting a position inconsistent with an earlier action or omission (*Dougherty v. Commissioner, supra; National Western Life Insurance Co. v. Commissioner,* 54 T.C. 33 (1970)), nor is the petitioner attempting to whipsaw the Commissioner by electing section 963 with the benefit of hindsight (*Denman Tire & Rubber Co. v. Commissioner, supra*). The petitioner's treatment of the payments from Int and Intfin as minimum distributions on its 1974 return served to bind the petitioner to a minimum distribution election (see *Tipps v. Commissioner,* 74 T.C. at 471; *Taylor v. Commissioner, supra; Sperapani v. Commissioner, supra*), the very election which the petitioner now urges us to recognize.

The Commissioner asserts that the information returns filed for the petitioner's controlled foreign corporations indicated that no election was made. However, the information returns (Forms 3646) filed with the petitioner's 1974 return do not clearly indicate that no election was made. Rather, the information returns are ambiguous and contradictory. During 1974, the petitioner intended to elect section 963 with respect to only 2 of its 22 controlled foreign corporations. On each Form 3646, the petitioner indicated in answers to two questions that no section 963 election was made with respect to the particular controlled foreign corporation for which the information return was filed. While such answers were correct for 20 of the controlled foreign corporations, they were not correct for Int and Intfin. Apparently, the petitioner's employees

prepared a master form and used it to complete the return for each controlled foreign corporation, even though different responses were required for Int and Intfin. Other portions of the returns for Int and Intfin were not completed in a manner consistent with such answers; for example, on each form, the petitioner indicated that it was computing the earnings and profits of the controlled foreign corporation under section 963. The information returns were certainly confusing, but they do not "clearly indicate that the petitioner did not elect section 963."

The Commissioner also asserts that the failure to include the election statement with the return prejudiced the conduct of his audit; he claims that he was unable to determine from the petitioner's return the method used by it for computing the minimum distribution, the corporations involved in the election, the information to be provided regarding each controlled foreign corporation, and the proper amounts of the distributions. Yet, in its application for an extension of time to file its return, which was filed with its 1974 return, the petitioner stated that it needed time to compute the minimum distribution. On Schedule C of its return (dividends), the petitioner included the payments that it received from Int and Intfin in 1975; it omitted any "Includable income from controlled foreign corporations" (subpart F income). In answer to the question "Were you a U.S. shareholder of any controlled foreign corporation?", the petitioner attached a schedule listing, for each of its controlled foreign corporations, the corporation's name, percentage of its stock owned by the petitioner, the date of incorporation, and location of its headquarters. Finally, the Forms 3646 filed for each controlled foreign corporation listed the earnings and profits of, and the foreign taxes paid or accrued by, each corporation. The petitioner's 1974 return certainly indicated that a minimum distribution had been received from one or more of the controlled foreign corporations, and the return provided all the information required to make the election with respect to each of the petitioner's controlled foreign corporations. Thus, the petitioner's return information provided the Commissioner with most of the information which the regulations required, even though it was not contained in a single election

statement. See *Hewlett-Packard Co. v. Commissioner*, 67 T.C. at 750.

The only information not contained in the return was the method elected and the names of the controlled foreign corporations whose subpart F income was excluded. This information, while important, was furnished during the audit, and there is no indication that the Commissioner's temporary lack of it prejudiced him in any way. On this record, we conclude that the petitioner substantially complied with the requirements for electing section 963 for 1974.

The second issue for decision is whether the petitioner effectively elected the 180-day distribution period for 1974. Sec. 1.963–3(g)(2), Income Tax Regs. Generally, minimum distributions must be received by the U.S. shareholder within 180 days after the close of its taxable year (sec. 1.963–3(a)(1)(i), Income Tax Regs.) and must be distributed from the earnings and profits of the controlled foreign corporation for its taxable year to which the election relates (sec. 1.963–3(a)(1)(iii), Income Tax Regs.). The distribution is treated as having been made from the proper year's earnings and profits if it is "made" during the "distribution period" of the controlled foreign corporation. Sec. 1.963–3(c)(1), Income Tax Regs. The distribution period ends 60 days following the close of the controlled foreign corporation's taxable year, unless the U.S. shareholder elects "in a statement filed with its return for the taxable year" to extend the distribution period up to 180 days following the close of the controlled foreign corporation's taxable year. Sec. 963(e)(1); sec. 1.963–3(g), Income Tax Regs.

The petitioner did not expressly elect the 180-day extended distribution period on its 1974 return, and the Commissioner argues that this omission precludes the petitioner's use of the extended period. The petitioner asserts that it is entitled to the 180-day period because its treatment of the 1975 distributions from Int and Intfin was in substantial compliance with the regulatory requirement that the election be made on a "statement" filed with the 1974 return. This issue was presented but not decided in *AMF Inc. v. United States*, 221 Ct. Cl. 788, 792, 610 F.2d 739, 742 (1979). In light of the circumstances of this case, we agree with the petitioner.

The regulation requires that the extended period be elected in a "statement" filed with the return but does not specify the

form of the statement. The petitioner's treatment of the 1975 distributions, which were received long after 60 days following the close of Int's taxable year on September 30, 1974, and Intfin's on October 31, 1974, was unequivocal and constituted an implicit election of the 180-day period. *Tipps v. Commissioner*, 74 T.C. at 471. The analysis concerning the election of section 963 is equally applicable here: the petitioner has complied with the essence of the statute, and the Commissioner has not demonstrated that he was prejudiced in any way by the petitioner's technical failure. The petitioner had not expressly elected the 180-day period since its 1966 return, but it had found it impossible to assemble the necessary financial information in 60 days. Consequently, the petitioner had always used the 180-day period. The Commissioner audited the petitioner's tax return for each year, and he must have been aware of the petitioner's practice. The Commissioner's failure to object, prior to 1974, to the lack of an express election statement certainly does not preclude him from raising such objection at this time, but his continued acquiescence in the petitioner's practice indicates to us that any prejudice he suffered was slight. Hence, we conclude that the petitioner effectively elected the 180-day distribution period for 1974.

The third issue for decision is whether the $995,000 distribution which the petitioner received from Int on April 14, 1975, was "made" within 180 days following the close of Int's taxable year on September 30, 1974. The $247,000 distribution which the petitioner *received* from Intfin on June 10, 1975, was not received within 180 days following the close of the petitioner's 1974 year (sec. 1.963–3(a)(1)(i), Income Tax Regs.), and the petitioner concedes that such distribution may not be applied toward Intfin's required distribution, if any, for 1974. The $995,000 dividend was declared but not paid within 180 days of the close of Int's taxable year. The petitioner asserts that the dividend was "made" when it was declared on March 17, 1975, because the petitioner constructively received it at such time. Sec. 1.451–2(b), Income Tax Regs. The Commissioner asserts that the constructive receipt doctrine is inapplicable in determining when a distribution is "made" for purposes of section 963. He contends that a minimum distribution is "made" when it is paid by the foreign corporation to the U.S. shareholder. Because Int did not actually pay the $995,000

distribution to the petitioner until April 14, 1975, after the expiration of Int's distribution period, the Commissioner concludes that the payment may not be credited toward Int's required minimum distribution for 1974.

Section 963 and its regulations do not specify when a distribution is deemed "made" for purposes of section 1.963–3(c)(1), Income Tax Regs. The constructive receipt doctrine provides that income is received by the taxpayer in the taxable year in which it is set aside for him or credited to his account, even though it is not actually reduced to his possession. Sec. 1.451–2(a), Income Tax Regs. Although a shareholder must generally report dividend income in the year dividends are actually paid, rather than the year in which they are declared (*Mason v. Routzahn*, 275 U.S. 175, 178 (1927)), dividends are constructively received regardless of actual payment when they are unqualifiedly made subject to the shareholder's demands. Secs. 1.301–1(b), 1.451–2(b), Income Tax Regs. The constructive receipt doctrine reflects economic reality and precludes the shareholder from deferring recognition of income over which he in fact is free to exercise dominion and control. See generally *Avery v. Commissioner*, 292 U.S. 210 (1934); *Bush Bros. & Co. v. Commissioner*, 73 T.C. 424, 438–439 (1979), affd. 668 F.2d 252 (6th Cir. 1982); *Kunze v. Commissioner*, 19 T.C. 29 (1952), affd. per curiam 203 F.2d 957 (2d Cir. 1953). However, as we stated in *Jerome Castree Interiors, Inc. v. Commissioner*, 64 T.C. 564, 570 (1975), "a shareholder is not taxable merely because he has the authority to influence the actions of the corporation and the authority to withdraw funds; funds are not constructively received until the corporation takes the necessary action to set them apart for him."

The petitioner would have us import the constructive receipt doctrine from the realm of tax accounting and devise a theory of "constructive distribution" for section 963. The petitioner has not explained why a rule designed to insure that tax is not deferred on income within the taxpayer's control should be applied to determine when minimum distributions are made. The issue before us is not when the distribution is includable in the U.S. shareholder's income. Section 963, itself, specifies that if the minimum distribution is in all respects proper, it is included in the shareholder's income for the year for which section 963 was elected, although it was made within

180 days after the close of such year. The constructive receipt doctrine is simply inapplicable in determining when a distribution is "made" for purposes of section 1.963–3(c)(1), Income Tax Regs. We refuse to hold that a "constructive distribution" within the distribution period will comply with the regulatory requirements.

Under the regulations, there are two requirements: the distribution must be "received" by the U.S. shareholder within 180 days following the close of its taxable year (sec. 1.963–3(a)(1), Income Tax Regs.), and it must be "made" by the controlled foreign corporation during its distribution period (sec. 1.963–3(c)(1), Income Tax Regs.). The Commissioner promulgated the section 963 regulations pursuant to a specific congressional grant of authority (sec. 963(e)(1) and (f)); there is no indication in the regulations that the Commissioner intended that a constructive, rather than an actual, distribution would satisfy the "made" requirement.

Moreover, we think that accepting the petitioner's constructive distribution theory would thwart the congressional purpose in enacting section 963. The petitioner's argument, in sum, is that, because Int was entirely subservient to the petitioner's wishes, because the dividend was effectively at the disposal of the petitioner's officers, and because the dividend could have been paid at any time after March 17, 1975, the dividend should be treated as if it were made on that date, even though it was not paid until April 14, 1975. The acceptance of the petitioner's theory would subvert the requirement of a timely minimum distribution. It may be that, in a case such as the present one, actual payment of the minimum distribution is a formality; but if so, the formality is congressionally mandated. Congress did not provide that a wholly owned first-tier controlled foreign corporation could satisfy its distribution requirement on the strength of its good intentions manifested merely by a dividend declaration. Congress expressly conditioned the benefits of section 963 on the making and receipt of the minimum distribution even though such payment could often amount to little more than a bookkeeping entry.

The petitioner knew of the regulatory requirements and had met the time limits in prior years. Int's delay in making the distribution was caused by the error or confusion of its officers.

In light of these circumstances, the petitioner's "constructive distribution" concept appears to be a variant of the substantial compliance doctrine. However, payment of the minimum distribution is the essence of section 963. Pursuant to an express grant of authority (sec. 963(e)(1) and (f)), the Commissioner has prescribed the periods within which the distribution must be made. The petitioner does not contend, nor could we hold, that the periods chosen by the Commissioner are unreasonable. Int's failure to comply with the statutory and regulatory requirements concerning the time for payment of the minimum distribution cannot be excused. *Penn-Dixie Steel Corp. v. Commissioner, supra.* On this record, we hold that Int's distribution of $995,000 was not "made" within 180 days following the close of its 1974 taxable year. Accordingly, such amount may not be counted toward Int's required minimum distribution for 1974.

Our resolution of this issue against the petitioner means that the $995,000 distribution is taxable to it in 1975, the year the payment was received. The petitioner contends that, in that case, the amount should be credited toward the required minimum distribution for 1975. The Commissioner agrees that the petitioner elected section 963 for such year and is entitled to receive a deficiency distribution for such year. The Commissioner does not contend that the $995,000 payment has failed to qualify as a partial minimum distribution. Sec. 1.963–3(a)(1) and (2), Income Tax Regs. Consequently, we conclude that the petitioner is entitled to count the $995,000 payment toward its deficiency distribution for 1975.

The fourth issue for decision is whether Intfin realized a loss in 1974 upon its conversion of a liability payable in foreign currency into one payable in U.S. dollars.

It is now agreed by the parties that Int had subpart F income of $2,208,677 for 1974, requiring a minimum distribution of $1,744,855 to AAF with respect to such year. The parties also agree that in 1974, Intfin had net income before tax of $373,517, without taking into account any loss on the SFE loan. However, the petitioner contends that such income was more than offset by the loss which it claims Intfin realized on the SFE loan conversion. Alternatively, Intfin contends that certain forward currency contract gains realized by it in 1974 did not constitute subpart F income. We first consider the

petitioner's contention that Intfin realized a loss in 1974 on the conversion of the SFE loan.

The petitioner argues that the conversion of the SFE loan from a liability payable in guilders to a liability payable in dollars was an identifiable event which fixed the amount of the foreign exchange loss. The Commissioner contends that Intfin did not realize such a loss in 1974 because the SFE loan transaction remained open with prospects of ultimate gain.

In general, a deductible loss must be evidenced by a closed and completed transaction, fixed by identifiable events, and actually sustained during the taxable year. Sec. 1.165–1(b), (d), Income Tax Regs.; *United States v. S. S. White Dental Mfg. Co.*, 274 U.S. 398 (1927); *Ewing Thomas Converting Co. v. McCaughn*, 43 F.2d 503 (3d Cir. 1930). An accrual method taxpayer may deduct a loss even though he has not paid it, so long as all events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. Sec. 1.461–1(a)(2), Income Tax Regs.; *C. F. Mueller Co. v. Commissioner*, 40 B.T.A. 195, 203 (1939). Losses that are contingent or speculative are not deductible, nor is a mere fluctuation in the value of property. *Lucas v. American Code Co.*, 280 U.S. 445 (1930); *Clark Dredging Co. v. Commissioner*, 63 F.2d 527 (5th Cir. 1933), affg. 23 B.T.A. 503 (1931); *Adams-Roth Baking Co. v. Commissioner*, 8 B.T.A. 458 (1927). However, a taxpayer need not show that there is no possibility of eventual recoupment in order to deduct a loss. *United States v. S. S. White Dental Mfg. Co., supra*. Likewise, the amount of the loss need not be ascertained with clinical precision; reasonable certainty is sufficient. *Commissioner v. Winthrop*, 98 F.2d 74 (2d Cir. 1938), affg. 36 B.T.A. 314 (1937); *Dana v. Commissioner*, 6 T.C. 177 (1946).

Transactions in foreign currency, which fluctuates in value with respect to the dollar, have long been held to result in taxable gains and deductible losses. *National-Standard Co. v. Commissioner*, 80 T.C. 551 (1983); *America-Southeast Asia Co. v. Commissioner*, 26 T.C. 198 (1956); *Church's English Shoes, Ltd. v. Commissioner*, 24 T.C. 56 (1955), affd. per curiam 229 F.2d 957 (2d Cir. 1956); *Willard Helburn, Inc. v. Commissioner*, 20 T.C. 740 (1953), affd. 214 F.2d 815 (1st Cir. 1954); *Joyce-Koebel Co. v. Commissioner*, 6 B.T.A. 403 (1927); *Bernuth Lembcke Co. v. Commissioner*, 1 B.T.A. 1051 (1925). Where the

U.S. dollar value of foreign currency borrowed by a taxpayer fluctuates between the time of borrowing and the time of repayment, a profit or loss may be realized by the taxpayer. *Gillin v. United States*, 191 Ct. Cl. 172, 423 F.2d 309 (1970); *National-Standard Co. v. Commissioner*, 80 T.C. at 557.

Final repayment of the foreign currency loan is usually the event that closes the transaction for tax purposes. Neither the occurrence of a gain or loss, nor the amount thereof, can be determined prior to repayment where the taxpayer is still subject to the risk of currency fluctuation. Cf. *Haviland v. Edwards*, 20 F.2d 905 (2d Cir. 1927). In the case before us, the Commissioner asserts that final repayment of the SFE loan was necessary to close the transaction. He notes that the conversion from guilders to dollars was executed on May 1, 1974, even though the loan agreement specified that currency conversions were to be made before January 15, 1974. The Commissioner argues that further conversions were possible; thus, he suggests that the ultimate gain or loss on the SFE loan transaction could not be known until Intfin finally repaid the loan.

The Commissioner relies on *Anderson, Clayton & Co. v. United States*, 562 F.2d 972 (5th Cir. 1977), and *B. F. Goodrich Co. v. Commissioner*, 1 T.C. 1098 (1943). In both cases, the taxpayer remained at risk in foreign currency until it repaid the foreign currency debts, and the ultimate gain or loss could not be determined until repayment of the debts. Cf. *Gillin v. United States, supra*; *Columbia Rope Co. v. Commissioner*, 42 T.C. 800 (1964); *Bennett's Travel Bureau, Inc. v. Commissioner*, 29 T.C. 350 (1957); *Foundation Co. v. Commissioner*, 14 T.C. 1333 (1950). In no case was there a holding that repayment of the debt would always be required in order to close the foreign loan transaction. In the circumstances of this case, we hold that Intfin closed the foreign exchange loan transaction in 1974, notwithstanding that it remained liable for the payment of U.S. dollars to SFE.

In October 1971, Intfin borrowed foreign currency then worth $3,750,000. By May 1974, the value of the dollar had declined so that Intfin's obligation, stated in dollars, was considerably greater. However, prior to May 1, 1974, such loss was unrealized because Intfin was still "at risk" in foreign currency. By converting its liability to dollars, Intfin fixed the

amount of its foreign exchange loss. The loan agreement between Intfin and SFE, as in effect during May 1974, provided that a change in currency would be effected by replacing the old currency loan with a loan of the amount of new currency currently necessary to purchase the principal amount of old currency and pay off the old currency loan. In essence, Intfin borrowed dollars from SFE, and such dollars were used to purchase guilders for Intfin's account to discharge the guilders liability. After May 1, 1974, Intfin knew with certainty the number of dollars that it would need to finally discharge its debt to SFE. Although Intfin was still liable to SFE, it had terminated its foreign exchange risk. Thus, Intfin, an accrual method taxpayer, did not have to wait until it finally terminated its dollar obligation to SFE in order to realize its loss on the foreign exchange transaction. Sec. 1.461–1(a)(2), Income Tax Regs. Any subsequent conversion of the SFE loan into a foreign currency would constitute a new foreign currency borrowing with a new potential for gain or loss. We hold that Intfin realized a loss of $1,226,855 in 1974 upon the conversion of the SFE liability from guilders to dollars, and its earnings and profits must be adjusted accordingly. Our holding makes it unnecessary to decide whether certain forward currency contract gains realized by Intfin in 1974 constituted subpart F income.

The fifth issue for decision is whether reasonable cause exists to permit the petitioner to receive a deficiency distribution from Int to satisfy Int's 1974 minimum distribution requirement. Section 963(e)(2) and section 1.963–6(b)(1), Income Tax Regs., provide that if a U.S. shareholder elects section 963 but fails to receive the full amount of the required minimum distribution in the required time, and if such failure results from "reasonable cause," then the U.S. shareholder may receive a "deficiency distribution" which is retroactively applied toward the minimum distribution. The regulations provide that if less than 80 percent of the amount of the minimum distribution is timely received, the U.S. shareholder must establish the existence of reasonable cause by clear and convincing evidence. Sec. 1.963–6(b)(4), Income Tax Regs.

The deficiency distribution regulation does not define reasonable cause. The regulation does provide, as its only example, that reasonable cause exists if a single first-tier corpora-

tion, for its taxable year, makes a distribution which would be a minimum distribution but for a refund of foreign income tax which it has paid in good faith under foreign law but which is found not to be due after the filing of the U.S. income tax return by the U.S. shareholder. Section 1.963–1(c)(3)(ii)(*b*), Income Tax Regs., provides that a section 963 election may be revoked or modified for reasonable cause and defines reasonable cause as the occurrence of "a material and substantial change in circumstances affecting the election * * * which reasonably could not have been anticipated when the election was made and which, to a significant degree, was beyond the control of the electing United States shareholder." Such regulation also includes the same foreign tax refund example used to illustrate reasonable cause for a deficiency distribution. We conclude that the standard for deciding whether reasonable cause exists to revoke or modify a section 963 election is equally applicable to determine whether reasonable cause exists for a deficiency distribution. Thus, the petitioner must establish, by clear and convincing evidence, that there occurred a material and substantial change in circumstances affecting the amount of the distribution which reasonably could not have been anticipated when the distribution was made and which to a significant degree was beyond the petitioner's control.

The Commissioner determined that the minimum distribution that the petitioner should have received from Int for 1974 was $1,744,855. The petitioner does not contest the Commissioner's determination; instead, the petitioner asserts that it should be permitted to make a deficiency distribution.

The petitioner's failure to receive the full minimum distribution from Int resulted from two different sets of circumstances. First, the petitioner believed that it had elected the completed contract method of accounting for Int for 1974 and subsequent years. By using such method, the petitioner computed Int's 1974 minimum distribution to be $995,000. However, the statement electing the completed contract method was never received by the Commissioner, who computed Int's minimum distribution to be $1,744,855 using the percentage of completion method. Thus, the petitioner's failure to receive $749,855 of the required minimum distribution was due to its erroneous belief that it had properly elected the

completed contract method of accounting for Int's long-term contracts. We need not determine whether the petitioner's explanation for its failure to receive this portion of the required amount constitutes reasonable cause, because we have determined that the petitioner's failure to receive the rest of the required minimum distribution ($995,000) in a timely manner was not due to reasonable cause.

We have held that the $995,000 distribution which Int made to the petitioner in 1975 cannot be counted toward Int's 1974 minimum distribution. Thus, the petitioner's failure to receive $995,000 of the minimum distribution was due to Int's failure to "make" the distribution within the distribution period. The petitioner offered no explanation for this failure other than "poor communications somewhere along the line as to the required date of payment." The petitioner has not proved that Int's failure to make the distribution in a timely manner was due to circumstances beyond its control. On the contrary, carelessness apparently caused the late payment. Consequently, we conclude that the petitioner's failure to receive the full required minimum distribution of $1,744,855 for 1974 from Int was not due to reasonable cause, and the petitioner is not now entitled to receive a deficiency distribution from Int for 1974.

The sixth issue for decision is whether reasonable cause exists to permit the petitioner to modify its election of the group method for 1975 and 1976 and receive deficiency distributions for such years computed in accordance with the chain method. The Commissioner made several adjustments to the earnings and profits and foreign taxes of the petitioner's subsidiaries for 1975 and 1976, and as a result, the petitioner must receive deficiency distributions if it is to obtain the section 963 exclusion for such years. The Commissioner does not contest the petitioner's right to receive deficiency distributions for 1975 and 1976 "provided that the necessary distributions are calculated on the group basis indicated on the written election" filed with the petitioner's 1975 and 1976 returns. However, the Commissioner denies that reasonable cause exists to permit the petitioner to modify its elections for 1975 and 1976.

The first of the Commissioner's adjustments concerned AAF-UK's British tax liabilities for 1975 and 1976. AAF-UK accrued British taxes of $796,713 in 1975 and $1,001,412 in

1976 although the taxes were deferred at least 1 year as a result of British tax relief legislation. The petitioner accounted for AAF-UK's accrued British taxes in making its section 963 elections for 1975 and 1976. In 1979, the tax deferral was made permanent. Accordingly, the Commissioner recomputed the 1975 and 1976 minimum distributions based on AAF-UK's having paid no British taxes for such years.

The petitioner accepts the Commissioner's determination that no British taxes may be used in determining the amount of the minimum distributions for 1975 and 1976. However, the petitioner asserts that it was reasonable for AAF-UK to accrue the British taxes for 1975 and 1976 and that it was reasonable for the petitioner to account for such taxes in determining its 1975 and 1976 elections and distributions. The petitioner contends that it could not reasonably have foreseen the forgiveness of the British tax liabilities in 1979 and that it should be permitted to modify its 1975 and 1976 elections to receive the necessary deficiency distributions under the chain method. For the reasons that follow, we agree with the petitioner.

Section 963(d) provides that the effective foreign tax rate (a factor determining the amount of the minimum distribution) of one or more controlled foreign corporations is computed with reference to the income taxes "paid or accrued to foreign countries * * * for the taxable year on or with respect to its earnings and profits for the taxable year." Section 7701(a)(25) provides that the term "paid or accrued" shall be "construed according to the method of accounting upon the basis of which the taxable income is computed." AAF-UK was an accrual method taxpayer; generally, a tax liability accrues when all the events have occurred which fix the amount of the tax and determine the liability of the taxpayer to pay it. *United States v. Anderson*, 269 U.S. 422 (1926). Under the "all-events test," AAF-UK may have improperly accrued the British taxes in 1975 and 1976 because the (then temporary) deferral may have precluded a final determination of liability in those years. However, the all-events test may not always provide the proper standard for determining whether a tax liability has "accrued" so as to be accounted for in determining the method for computing, or the amount of, a minimum distribution. In our judgment, AAF-UK acted reasonably in accruing the taxes

for 1975 and 1976, the years during which it earned the relevant income, even though the British statutes permitted AAF-UK to defer payment of such taxes. See W. Gifford, Controlled Foreign Corporations—Section 963, 105–3d Tax Management Portfolio A-14–A-15 (1975).

The indirect foreign tax credit provisions of section 902 contain language very similar to the "paid or accrued * * * on or with respect to its earnings and profits for the taxable year" language of section 963(d). The foreign tax credit attempts to avoid double taxation of foreign source income by crediting foreign taxes against U.S. tax liability. The courts and the Commissioner have recognized that, in certain instances, the foreign tax should "accrue" for purposes of the foreign tax credit in the period in which the income subject to the tax accrues even though, under traditional accrual principles, such foreign tax is not properly accruable. *Carter, Rice & Co. v. Commissioner*, 28 B.T.A. 687 (1933); *Cuba Railroad Co. v. United States*, 124 F. Supp. 182 (S.D. N.Y. 1954); Rev. Rul. 70–303, 1970–1 C.B. 161; Rev. Rul. 58–55, 1958–1 C.B. 266; E. Owens, The Foreign Tax Credit 327–333 (1961). A special definition of "accrual" is necessary so that payments of foreign taxes with respect to the income of a given year are offset against U.S. tax liability otherwise imposed on such income.

There was reason for the petitioner and AAF-UK to believe that the "matching" concept of section 902 inheres in section 963 as well. Section 963 was designed to provide relief for U.S. shareholders when the total combined U.S. and foreign tax rate on the foreign income accruing to controlled foreign corporations during the taxable year for which an election was made approximated the U.S. tax rate on such income. The amount of the minimum distribution for a year should relate to the foreign income earned in that year. The relationship is distorted when the effective foreign tax rate used to compute the minimum distribution for a year does not reflect taxes chargeable to income earned in such year. During 1975 and 1976, AAF-UK faced a choice: it could "accrue" the then temporarily deferred tax liabilities in such years, or it could wait to accrue them until they were ultimately "clawed back." If AAF-UK chose the latter course, it risked distorting the amount of minimum distributions for 1975, 1976, and also for later years, since the effective foreign tax rate would thus be

understated during the earlier years and overstated during the later years. Accordingly, we conclude that AAF acted reasonably in accounting for AAF-UK's then temporarily deferred 1975 and 1976 British tax liabilities when it determined the minimum distribution method to elect under section 963 for such years.

During 1975 and 1976, AAF-UK could not reasonably anticipate that its deferred British tax liabilities would ultimately be forgiven. Indeed, the petitioner's management reasonably believed that all such taxes would eventually be clawed back. The tax liabilities were substantial, totaling over $1.7 million for the 2 years. The petitioner's determination of the method to elect for 1975 and 1976 might well have been different had it known that AAF-UK would ultimately owe no British taxes for such years. The forgiveness of AAF-UK's British tax liabilities for 1975 and 1976 was, under any reasonable reading of section 1.963–1(c)(3)(ii)(b), Income Tax Regs., a "material and substantial change in circumstances affecting the election * * * which reasonably could not have been anticipated when the election was made and which, to a significant degree, was beyond" the petitioner's control. Accordingly, we conclude that reasonable cause exists to permit the petitioner to receive deficiency distributions for 1975 and 1976 determined under the chain method.

*Decisions will be entered under Rule 155.*